# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| GARNET BIOTHERAPEUTICS, INC., | ) | Case No. 10-14165 (___) |
| | ) | |
| Debtor. | ) | |

## DECLARATION OF GERALDINE A. HENWOOD
## IN SUPPORT OF FIRST DAY PLEADINGS

Geraldine A. Henwood, being duly sworn, deposes and states as follows:

1. I am the Interim Chief Executive Officer of Garnet BioTherapeutics, Inc. (the "Debtor" or the "Company"), a privately held corporation organized under the laws of the state of Delaware and the above-captioned debtor and debtor in possession. I submit this Declaration in support of the Debtor's chapter 11 filing and the First Day Pleadings (defined below). Any capitalized terms not expressly defined herein have the meanings given to them in the applicable First Day Pleading. Except as otherwise indicated, all statements in the Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtor's operation and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents or opinion. I am authorized to submit this Declaration on behalf of the Debtor.

2. On December 28, 2010 (the "Petition Date"), the Debtor commenced a chapter 11 bankruptcy case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware.

3. To enable the Debtor to minimize any adverse effect of the commencement of the Chapter 11 Case on its business, the Debtor is requesting various types of relief in certain "first day" motions (collectively, the "First Day Pleadings"). The First Day Pleadings seek relief, among other things, to: (a) obtain access to the remaining availability of its cash and senior secured line of credit to fund the operation of the business; (b) maintain employee confidence and morale; (c) maintain its existing bank account; and (d) establish certain administrative procedures to promote a smooth transition to chapter 11.

4. Part I describes the debtor's business, capital structure and the circumstances giving rise to the commencement of the Chapter 11 case. Part II sets forth relevant facts in support of the First Day pleadings.

I. **Background**

A. **The Debtor's Business**

5. The Debtor is a development stage biopharmaceutical company and has been since its inception in 2000. The Company developed a unique cellular therapy with the potential to significantly improve upon the treatment of numerous diseases. This therapy, comprised of human adult bone marrow-derived somatic cells, is designed to supplement and stimulate the body's natural repair mechanism when it is overwhelmed by illness or injury. By promoting the repair and regeneration of damaged tissue, this investigational treatment may also have the potential to reverse or significantly modify the course of certain diseases, unlike existing therapies which may only slow or halt the progression of the disease.

6. Because of the developmental nature of the business, there are no commercial revenues to date. Therefore, continuation of business activity is wholly dependent on continuing rounds of investor funds.

7. Initially, the lead therapeutic interest was cardiac, which proved to be exceedingly costly and would take a long time to become a commercial reality. The company expended approximately $45 million of prior investment funds and eight years (2000 – 2008) in pursuit of the cell development and cardiac interests.

8. In 2008, a new investor group determined that the technology developed up to that time could be aimed at alternative areas of interest. Accordingly, a re-capitalization investment of $10.4 million was made in 2008, at which time the Debtor's name was changed to Garnet BioTherapeutics, Inc.,[1] and new management focused the Company's development and clinical efforts towards therapies for diseases in which there is significant unmet medical need. The Company first intended to develop its cellular therapy in the treatment of post-surgical wound repair with a goal of providing significantly reduced scarring or 'scarless' healing in patients undergoing elective cosmetic surgeries. The Company believed that it could reach the proof of concept milestone in 2010 and commercial launch within approximately two years thereafter.

9. In the summer of 2010, in anticipation of a new financing transaction expected to close in the fall of 2010, four existing investors advanced unsecured demand loans in the total amount of $500,000 (the "Bridge Loans") to the Company to fund its continuing operations at that time.

B. **Research &Development Categories**

10. In mid-year 2010, the Company commenced discussions / negotiations with potential investors for additional funding in support of four business initiatives:

- Expanded clinical trial for efficacy in healing of incisional scars;
- Extension of the therapy technology to additional, less expensive to develop applications, i.e. a cellular 'device' prototype for tendon repair and healing;

---

[1] Prior to this time, the Debtor's name was Neuronyx, Inc.

3

- Further development of an automated, improved method of cell production that lowers manufacturing costs and provides quicker timeframes for production; and

- In the above automated cell production process, equine cells were used to evaluate improvements in the cell manufacturing process (so as to not waste human cells). Because the equine cells proved to be so prolific in the manufacturing optimization studies, the Company began to investigate veterinary opportunities for use of these cells for animal injuries.

11. In early October, 2010, the potential investor group expressed discord with the Company's future business direction as well as the terms and conditions for a further financing. The proposed financing did not close; further exacerbating the Company's financial position. Employees were furloughed while Management and the Board of Directors searched for alternative sources of financing.

12. In early December, 2010, the Debtor obtained an $800,000 secured line of credit from Silicon Valley Bank (the "Line of Credit") consisting of two term loan tranches of $400,000 each ("Term Loan A" and "Term Loan B"). On or about December 15, 2010, the Debtor took a $400,000 draw on Term Loan A. Term Loan B provides for additional advances of up to $400,000 in minimum increments of $100,000.

### C. Pre-Petition Capital Structure

13. The Line of Credit is the Debtor's only secured debt. The total amount owed on the Line of Credit as of the Petition Date is $400,000 plus minimal accrued interest. The total amount owed on the Bridge Loans as of the Petition Date, including accrued interest, is approximately $524,000. In addition, the Company has approximately $1,700,000 of unsecured trade payables, accrued liabilities and other liabilities as of the Petition Date. As of the Petition Debtor, the Debtor has approximately $125,000 in its sole bank account.

D.  **Events Leading to Bankruptcy**

14. The Company is still in the developmental stage and has no commercial revenues. Accordingly, the Company is wholly dependent on investor funds. As discussed above, the Company was in discussions with potential investors but those discussions broke down in October, 2010 due to a disagreement over the future direction of the Company. As a result, the Company has no operating funds.

15. Without funds to operate, the Company has fallen behind on its' obligations, leading to increasing pressures as creditors escalate their collections efforts. By way of example, the Landlord has threatened a lock-out, certain construction vendors are prosecuting a mechanic's lien and requesting arbitration and two former employees have initiated complaints for payment of unpaid wages and benefits. Accordingly, the Company filed for bankruptcy protection to give it the opportunity to restructure its debt and capital structure. This restructuring may involve the sale of certain of its business segments either during the bankruptcy process or following the Company's emergence from bankruptcy.

II. **Summary of First Day Pleadings**

**Debtor's Motion for Order Authorizing Debtor to (A) Continue and Maintain Its Cash Management System and Existing Bank Account and (B) Continue Use of Existing Business Forms**

16. The Debtor's cash management system consists of a single bank account (the "Bank Account") with Silicon Valley Bank, which was opened in early December, 2010.

17. The Debtor requests a waiver of the requirement that a new bank account be opened to replace the Bank Account so that it can continue to operate in the ordinary course. The Debtor also seeks authority to continue to use its checks and business forms (the "Business Forms") during the pendency of this Chapter 11 case.

18. The Debtor also seeks a waiver of the requirement that the legend "debtor-in-possession" be imprinted on any existing Business Forms, including checks, and request that its bank be permitted to honor pre-petition checks as they are presented to the extent authorized by other orders of this Court. The Debtor will instruct its bank to add the designation "Debtor-in-Possession" or "DIP" to all Business Forms ordered during the pendency of the Chapter 11 Case, will treat the Bank Account for all purposes as an account of the Debtor as debtor-in-possession, and will maintain records that recognize the distinction between post-petition and pre-petition activities.

19. For the foregoing reasons, I believe that the request regarding the continuance and maintenance of the Debtor's cash management system, existing Bank Account and the use of its existing Business Forms is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of these cases and the Debtor's reorganization efforts.

**Motion of Debtor Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order (I) Authorizing Payment of Pre-Petition Wages, Compensation, Payroll Taxes, and Employee Benefits and (II) Authorizing Debtor to Maintain Their Existing Employee Programs**

20. The Debtor requests, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, that the Court authorize the Debtor to pay (a) in its sole discretion, (i) all obligations related to Wages, (ii) all Payroll Taxes related to the Wages, (iii) its existing Health plan, and (iv) all costs with regard to services provided by its current employees during the pre-petition period and (b) maintain the Health Plan as it was in effect as of the Petition Date, and as it may be modified, amended, or supplemented from time to time in the ordinary course.

21. As of December 28, 2010, the Debtor employed 2 individuals. The continued operation of the Debtor's business as a going concern depends largely upon the retention of the

services of these employees and the maintenance of employee morale and cooperation. Maintaining the Debtor's business as a going concern is critical to maximizing the value of the Debtor's assets. Consequently, it is critical that the Debtor be authorized to satisfy its employee related obligations and continue its ordinary course employee plans, policies, and programs in effect as of the Petition Date.[2]

22. Accordingly, I believe that the authority to pay all employee obligations in accordance with the Debtor's prepetition business practices is in the best interests of the Debtor and its estate and will enable the Debtor to continue to operate its business in chapter 11 without disruption. Without the requested relief, the stability of the Debtor will be undermined by the distinct possibility that otherwise loyal employees will seek other employment alternatives.

**Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, and 364 Pursuant to the Debtor's Pre-Petition Credit Agreement and (C) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (III) Scheduling Final Hearing Pursuant to <u>Bankruptcy Rules 4001(b) and (c)</u>**

23. The Debtor requests the entry of Interim and Final orders (I) authorizing the Debtor (a) to obtain post petition financing pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code and (b) to utilize cash collateral pursuant to section 363 of the Bankruptcy Code, (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c).

---

[2] The Debtor believes that, as of the Petition Date, it is current on all employee obligations with respect to its current employees through December 31, 2010. Nonetheless, out of an abundance of caution, the Debtor requests authority to pay any employee obligations with respect to current employees. The Debtor is not requesting authority to pay any pre-petition amounts with respect to former employees.

7

24. Substantially all of the cash in the Bank Account are proceeds of the funds from the Debtor's draw on the Line of Credit and the Bank Account is subject to a control agreement. Accordingly, all of the Debtor's cash is the Lender's cash collateral. Moreover, because it has no revenue, the Debtor will need additional cash availability to fund its expenses through the bankruptcy process. Accordingly, the Debtor will need authority to make additional draws on the Line of Credit.

25. The Debtor has an immediate need to obtain use of cash collateral and additional funds from the Line of Credit in order to continue its business operations and for the orderly administration of its estate. Without cash availability, the Debtor would be unable to pay necessary expenses and its business would shut down.

26. The Debtor shopped extensively for financing. In October, 2010, after it was unable to obtain additional equity funding, the Debtor was unable to obtain financing on an unsecured basis. SVB was the only financial institution that was willing to lend to the Debtor on a secured basis, and that was conditioned on obtaining a guarantee from one of the Debtor's shareholders, SCP Vitalife II Partners, L.P. ("SCPV"). The Debtor initially believed that SVB would be providing it with post-petition financing as well. The Debtor subsequently learned, however, that SVB would not provide post-petition financing and would require a buyout from SCPV upon a bankruptcy filing. The Debtor then consulted with a broker with experience in arranging post-petition financing but the broker was unable to obtain even an expression of interest from any party to provide post-petition financing to the Debtor. Accordingly, I believe that authorization to use cash collateral and to make further draws on the Line of Credit with SCPV as the lender is in the best interest of the Debtor, its estate, and its creditors.

27. Based on the foregoing, I believe the approval of First Day Orders is in the best interests of all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 28, 2010

_Geraldine A. Henwood_
Geraldine A. Henwood
Interim Chief Executive Officer