# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| GARNET BIOTHERAPEUTICS, INC., | ) | Case No. 10-14165 (BLS) |
| | ) | |
| Debtor. | ) | |

**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105 AND 364 PURSUANT TO A PRE-PETITION CREDIT AGREEMENT AND (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363, AND 507; AND (III) SCHEDULING FINAL HEARING <u>PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)</u>**

Garnet BioTherapeutics, Inc., as debtor and debtor in possession (the "Debtor" or "Garnet"), hereby moves this Court pursuant to Sections 105(a), 362, 363, and 364(c), (d), and (e) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for the entry and approval of interim and final orders authorizing it to (i) incur post-petition secured indebtedness in the maximum amount of $100,000 on an interim basis and $400,000 on a final basis pursuant to that certain pre-petition Loan and Security Agreement (as amended), dated as of December 10, 2010, (the "Loan and Security Agreement")[1] by and between the Debtor and Silicon Valley Bank ("SVB"),[2] (ii) grant to the Lender post-petition liens and security interests, (iii) use the Lender's cash collateral and (iv) grant adequate protection to the Lender. In support of the Motion, the Debtor relies on and incorporates by

---

[1] A Copy of the Loan and Security Agreement is attached hereto as Exhibit A.

[2] The Debtor understands that, prior to the hearing on this Motion, SVB will assign all of its rights and obligations under the Loan and Security Agreement (the "Assignment") to SCP Vitalife Partners II, L.P. (the "Lender"), one of the Debtor's shareholders. The Debtor understands that the Lender will consent to the relief requested in this Motion.

reference the Declaration of Geraldine A. Henwood in Support of First Day Pleadings (the "Henwood Declaration").

## SUMMARY OF RELIEF REQUESTED AND HIGHLIGHTED PROVISIONS

1. By this motion ("Motion"), the Debtor (a) requests authority to (i) incur secured post-petition indebtedness in accordance with and pursuant to the terms of the Loan and Security Agreement pursuant to section 364 of the Bankruptcy Code; (ii) use the Lender's Cash Collateral (defined below) pursuant to section 363 of the Bankruptcy Code; (iii) grant to the Lender adequate protection liens and superpriority administrative expense claims pursuant to sections 361, 363, and 507 of the Bankruptcy Code; and (b) requests that the Court schedule a final hearing (the "Final Hearing") on the Motion. Pursuant to Rules 4001(b) and 4001(c) of the Federal Rules of Bankruptcy Procedure and Del. Bankr. L.R. 4001-2, the provisions to be highlighted in the Interim Order are as follows:[3]

   (a) *Maximum Borrowing Available*. The maximum amount available to Borrower under the Loan and Security Agreement is $800,000. $400,000 was advanced under the Loan and Security Agreement prior to the Petition Date (defined below) (the "Pre-Petition Advance"). Accordingly, $400,000 remains available for borrowing under the Loan and Security Agreement. Additional borrowings must be made in increments of not less than $100,000. Loan and Security Agreement, § 2.1; Interim Order, ¶ C.

   (b) *Interest Rate*. Loans made under the Loan and Security Agreement (the "Loans") shall bear interest at a floating rate, which shall be the greater of (a) Silicon Valley Bank's most recently announced "prime rate" and (b) four percent (4.0%) (the "Prime Rate"), with a 5% upward adjustment in the event of a default. Interest is payable monthly on the first calendar date of each month. The Debtor will make monthly interest payments on the Pre-Petition Advance. Loan and Security Agreement §§ 2.2 and 13.1.

   (c) *Maturity Date*. The Maturity Date of the Loan and Security Agreement, unless extended, is the earlier of (i) July 1, 2011 and (ii) the date of the occurrence of a Liquidity Event. A Liquidity Event is described as "(a) a

---

[3] All terms used but not defined herein shall have the meanings ascribed to them in the Loan and Security Agreement.

2

sale by [Debtor] of a material portion of its assets; (b) a merger or consolidation of [Debtor] into or with another person or entity; or (c) any sale, in a single transaction or series of related transactions, by the holders of [Debtor's] outstanding voting equity securities, to one or more buyers, of such securities, where such holders do not, as of immediately following the consummation of such transaction(s), continue to hold at least a majority of [Debtor's] issued and outstanding voting equity securities. All principal and interest on the Loans will become immediately due and payable upon the Maturity Date. Loan and Security Agreement §§ 2.1.1(b) and 13.1.

(d) *Events of Default*. Events of Default under the Loan and Security Agreement ("Events of Default" and each an "Event of Default") include, but are not limited to, (i) failure to pay any interest, principal, fees, and charges when due; (ii) covenant violations; (iii) certain judgments; and (iv) material misstatements or misrepresentations; Loan and Security Agreement §9.01. Interim Order 3 at 11.

(e) *Liens and Perfection*. The Lender will be granted first priority, continuing, valid, binding, enforceable, nonavoidable, and automatically perfected security interests and liens (subject only to the Carve-Outs) on all currently existing and after acquired or arising property and assets of any kind other than avoidance actions under chapters 5 and 7 of the Bankruptcy Code ("Avoidance Actions") and the proceeds thereof. The Lender will also be granted, subject to the Carve-Outs, a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code. Loan and Security Agreement § 8. Interim Order, ¶¶ 4 and 5.

(f) *Indemnification*. The Debtor provides general indemnification to the Lender and its agents, employees, representatives and affiliates with respect to the transaction contemplated by the Loan and Security Agreement. Loan and Security Agreement §12.2. In consideration for Geraldine A. Henwood's agreement to remain in her position as Interim Chief Executive Officer of the Debtor during the pendency of this bankruptcy case, the Lender will agree to indemnify Ms. Henwood against: (a) all obligations, demands, claims, and liabilities (collectively, "Claims") claimed or asserted by any other party arising from or as a result of any action by Ms. Henwood in her capacity as Interim Chief Executive Officer and/or a member of the board of directors of the Debtor arising either prior or subsequent to the Petition Date; and (b) all losses or expenses in any way suffered, incurred, or paid by Ms. Henwood as a result of, following from, consequential to, or arising from any action by Ms. Henwood in her capacity as Interim Chief Executive Officer and/or a member of the board of directors of the Debtor arising either prior or subsequent to the Petition Date, except for Claims and/or losses directly caused by Ms. Henwood's gross negligence or willful misconduct. Interim Order, ¶ 13.

(g) *No Lien on Avoidance Actions.* The Debtor's obligations under the Loan and Security Agreement are not secured by any liens on avoidance actions under §§ 544, 545, 546, 548, 549, 553(b), 723(a) and 724(a) of the Bankruptcy Code. Interim Order, ¶¶ 4, 5 and 6.

(h) *Fees.* The Debtor paid a Commitment Fee in the amount of $4,000 on account of the Pre-Petition Advance. The Debtor is required to pay an additional fee of 1% of the principal amount of any further advances. In addition, the fees and expenses incurred by the Lender will be paid from cash collateral and the proceeds of the Loan and Security Agreement. Loan and Security Agreement §2.5. Interim Order.

(i) *Carve-Outs.* Carve-Outs are provided in the total amount equal to the following: (i) statutory fees payable to the United States Trustee and (ii) following the Maturity Date, the payment of allowed professional fees and disbursements incurred by the Debtor or any official committee of unsecured creditors appointed in this case (the "Creditors' Committee") in an aggregate amount incurred after the Maturity Date not in excess of $25,000 (plus all unpaid professional fees and expenses allowed by the Court that were incurred prior to the occurrence of the Termination Date). Interim Order, ¶ 7.

(j) *Name of Each Entity with Interest in Cash Collateral.* Currently Silicon Valley Bank. Following the Assignment, the Lender will be the only person with an interest in the cash collateral.

(k) *Purposes of Use of Loan Proceeds and Cash Collateral.* Working capital, professional fees, and other uses as set forth in the Budget (defined below). Interim Order, ¶ 2.

(l) *Duration of Use of Cash Collateral.* Through the Maturity Date of the Loan and Security Agreement. Interim Order, ¶ 3.

(m) *Adequate Protection to Be Provided to Each Entity with Interest in Cash Collateral.* As adequate protection against diminution in the value of its collateral, the Lender will receive the following: (i) subject to the Carve-Outs, a lien on currently existing and subsequently acquired assets, other than Avoidance Actions and the proceeds thereof, to the extent of diminution resulting from use of cash collateral; (ii) payment of the fees and expenses incurred by professionals engaged by the Lender; (iii) payment of interest on the Pre-Petition Advance; and (vi) a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code to the extent of diminution resulting from the Debtor's use of cash collateral. Interim Order, ¶ 6.

(n) ***Cross Collateralization Protection.*** The Lender will receive liens on all currently existing and subsequently acquired assets to secure any diminution in its pre-petition collateral. Interim Order, ¶ 6.

(o) ***Binding the Estate to Validity, Perfection, or Amount of Secured Creditor's Pre-petition Lien.*** The Interim Order contains stipulations by the Debtor as to the validity, enforceability, priority and amount of the debt and the Lender's liens, subject to a challenge period of the later of seventy-five (75) days following the Petition Date or sixty (60) days following the appointment of Creditors' Committee. Interim Order, ¶¶ E, 10 and 11.

## BACKGROUND

2. On December 28, 2010 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is operating its business and managing its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3. Garnet is a clinical stage biopharmaceutical company that started in 2000[4]. The company has developed a cellular therapy with the potential to significantly improve upon the treatment of numerous diseases. This therapy, comprised of human adult bone marrow-derived somatic cells, is designed to supplement and stimulate the body's natural repair mechanism when it is overwhelmed by illness or injury. By promoting the repair and regeneration of damaged tissue, this investigational treatment may also have the potential to reverse the course of certain diseases, unlike existing therapies which may only slow or halt the progression of the disease.

4. As additional background and support for this Motion, the Debtor refers this Court to the Henwood Declaration, filed contemporaneously herewith and incorporated herein by reference.

---

[4] The original name of the Debtor was Neuronyx, Inc. and it changed its name in 2008.

## JURISDICTION

5. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE DEBTOR'S CAPITAL STRUCTURE

6. The Debtor's only secured debt is the debt arising from the Pre-Petition Advance made pursuant to the Loan and Security Agreement (the "Indebtedness"). The total amount of the Indebtedness as of the Petition Date is $400,000 plus minimal accrued interest.

7. In the summer of 2010, in anticipation of a new financing transaction expected to close in the fall of 2010, four existing investors advanced unsecured demand loans in the total amount of $500,000, collectively (the "Bridge Loans"), to the Debtor to fund its continuing operations. The Debtor has made no payments on the Bridge Loans and the total amount owed on the Bridge Loans, as of the Petition Date, including accrued interest, is approximately $524,000. In addition, the Company has approximately $1,700,000 of unsecured trade payables, accrued liabilities and other liabilities as of the Petition Date. As of the Petition Debtor, the Debtor has approximately $125,000 in its sole bank account.

8. Without prejudice to the rights, if any, of any other party (but subject to the limitations thereon described below in paragraphs 19 and 20, the Debtor stipulates that (i) the Indebtedness totals $400,000 as of the Petition Date, exclusive of interest attorneys fees, costs, expenses or other charges; (ii) the Indebtedness constitutes the legal, valid and binding obligations of the Debtor, enforceable in accordance with the Loan and Security Agreement; (iii) no portion of the Indebtedness is subject to avoidance, subordination, recharacterization, offset, counterclaim or defense; and (iv) the Debtor granted to SVB valid, perfected and enforceable liens upon and security interests (the "Pre-Petition Liens") in the collateral described in the Loan

and Security Interest (the "Pre-Petition Collateral"). The Debtor further stipulates that, following the Assignment, all of SVB's rights with respect to the Loan and Security Agreement will inure to the benefit of the Lender.

## EFFORTS TO OBTAIN FINANCING

9. Prior to the Petition Date, the Debtor shopped extensively for financing. In October, 2010, after it was unable to obtain additional equity funding, the Debtor was unable to obtain financing on an unsecured basis. SVB was the only financial institution that was willing to lend to the Debtor on a secured basis, and that was conditioned on obtaining a guarantee from the Lender. The Debtor initially believed that SVB would be providing it with post-petition financing as well. However, the Debtor subsequently learned that SVB would not provide post-petition financing and would require a buyout by the Lender upon a bankruptcy filing. The Debtor then consulted with a broker with experience in arranging post-petition financing; however, the broker was unable to obtain even an expression of interest from any party to provide post-petition financing to the Debtor.

## RELIEF REQUESTED

10. Garnet respectfully requests the authority to (i) obtain senior secured, superpriority post-petition financing in the aggregate not to exceed $400,000 pursuant to the terms of this Motion and the Loan and Security Agreement, (ii) to use cash collateral and grant adequate protection as set forth herein.

11. Following the Assignment, the Lender will be SCP Vitalife Partners II, L.P., one of the Debtor's shareholders (a and one of the investors that advanced a portion of the Bridge Loans). Amounts subsequently advanced by the Lender to the Debtor will have superpriority administrative expense claim status and be secured by a post-petition lien on substantially all of the Debtor's assets senior to the Pre-Petition Liens securing the Indebtedness.

12. Pending entry of the final order authorizing the Debtor to incur post-petition indebtedness pursuant to the Loan and Security Agreement (the "Final DIP Order"), Garnet requests that the Court authorize it, on an interim basis, to (i) borrow up to $100,000 pursuant to the terms of the Loan and Security Agreement; (ii) use cash collateral as set forth herein; (iii) grant to the Lender the liens and superpriority claims described herein; (iv) approve the proposed notice of the Final Hearing; and (v) schedule the Final Hearing.

### DEBTOR'S PROPOSED POST-PETITION FINANCING ARRANGEMENT

13. The Debtor is, and has always been, a developmental stage company. Accordingly, the Debtor has no commercial revenue. The Debtor has filed this chapter 11 petition so that it may maintain minimal operations while it restructures its debts and capital structure. The Debtor believes that, after its debt restructuring through the chapter 11 process, it will be able to emerge from bankruptcy, continue to develop its promising technology, and eventually become a commercially viable company.

14. The Loan and Security Agreement provides a maximum facility of $800,000. Following the Pre-Petition Advance, $400,000 in availability remains, which must be drawn down in increments of at least $100,000. Approved expenditures under the Loan and Security Agreement are limited to the amounts set forth in the budget attached hereto as Exhibit B (the "Budget").

15. The Lender will receive the protections available for post-petition financing under sections 364(c)(1) and 364(d), including that any obligations owed to the Lender under the Loan and Security Agreement following the Petition Date will constitute a superpriority administrative claim and will be secured by a lien on substantially all assets of the Debtor, other than Avoidance Actions, senior in priority to the Pre-Petition Liens (the "Post-Petition Liens"). The Post-Petition

Liens will be subject to carve-outs provided for the Office of the United States Trustee and certain specified professionals in the case (collectively, the "Carve-Outs").

## USE OF CASH COLLATERAL AND
## PROPOSED ADEQUATE PROTECTION

16. The Budget requires use of cash on hand and any proceeds of the Lender's Collateral (the "Cash Collateral") to fund budgeted operation expenses. As of the Petition Date, the Debtor had cash on deposit in the amount of approximately $125,000. The account in which the cash is held is subject to a control agreement for the benefit of SVB, which will be assigned to the Lender in connection with the Assignment. Accordingly, the Debtor requests authority to use the Cash Collateral to fund its operations during the pendency of this chapter 11 case.

17. Subject to the Carve-Outs, the Lender shall be granted the following as adequate protection for the interests of the Lender in the Cash Collateral, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to the extent that there is a diminution in the value of the Cash Collateral from and after the Petition Date: (i) a lien on all currently existing and after acquired assets, other than Avoidance Actions and the proceeds thereof (the "Replacement Liens"), to the extent of diminution resulting from use of Cash Collateral; (ii) payment of the fees and expenses incurred by professionals engaged by the Lender; (iii) payment of interest on the Indebtedness; and (vi) a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code to the extent of diminution resulting from the Debtor's use of Cash Collateral.

18. The Replacement Liens shall be junior only to the liens granted to secure post-petition advances under the Loan and Security Agreement and the Carve-Outs. The Replacement Liens are and shall be valid, perfected, enforceable, and effective without any further action by the parties.

**LIEN REVIEW AND LIEN CONTESTS**

19. Pursuant to the proposed Interim Order, the Debtor's stipulations and releases contained in paragraph 8 herein (i) shall be binding on the Debtor and (ii) shall be binding upon all other parties in interest, including the Creditors' Committee and any other official committee appointed in these Chapter 11 Cases unless (1) a party has properly filed an adversary proceeding by the later of (i) the date that is seventy-five days from the date of the entry of the Interim Order, and (ii) sixty (60) days from the appointment of a Creditors' Committee (the "Investigation Termination Date") challenging the validity, perfection, enforceability, and extent of the Indebtedness and Pre-Petition Liens and any potential claims of the Debtor or its estate against the Lender, as assignee of SVB. Any such adversary proceeding challenging the Indebtedness or Pre-Petition Liens or the assertion of any other claims or causes of action of the Debtor or its estate against the Lender, as assignee of SVB, must be made by a party in interest with standing and must be properly commenced on or before the Investigation Termination Date. If no such action is filed on or before the Investigation Termination Date, all holders of claims and interests as well as other parties in interest will be forever barred from bringing or taking any such action, and the Debtor's stipulations and releases made in paragraph 8 will be binding on all creditors and parties in interest. Professional fees and expenses incurred by the Creditors' Committee or any other Court-appointed professional in connection with any review and investigation may not exceed $10,000.

20. Pursuant to the proposed Interim Order, no Court-appointed professional will be entitled to payment of any fees or expenses from the proceeds of DIP Financing, Cash Collateral or the Carve-Out for commencing or prosecuting any claim or action, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or

similar relief (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Indebtedness or the Pre-Petition Liens; or (y) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the Lender of any of its rights and remedies under the Interim Order.

## THE DEBTOR SHOULD BE AUTHORIZED TO OBTAIN POST-PETITION FINANCING

21. Authorizing the Debtor to incur post-petition indebtedness pursuant to the Loan and Security Agreement will provide the Debtor with the funds necessary to maintain minimal operations. Garnet has no other source of funds available to meet its ongoing operational expenses. Absent approval of post-petition financing, the Debtor will be forced to cease all operations, the Debtor will be unable continue to develop its technology, and the potential commercial value of all the developments made to date will be lost.

22. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses, as specified in Section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. The Debtor proposes to obtain the financing set forth in the Loan and Security Agreement by providing, *inter alia*, superpriority claims, security interests, and liens pursuant to Sections 364(c)(1), (2), and (3) of the Bankruptcy Code.

23. Bankruptcy courts grant a debtor considerable deference as to post-petition financing in acting in accordance with its business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep 7*

*Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985).

24. Although, Section 364(d) mandates that the Debtor seek unsecured and subordinated secured financing before it may receive authority to grant priming liens or super priority claim status, it does not require that a debtor seek alternative financing from every possible lender. Rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991 (debtor adequately established that some degree of priming of loan was necessary if debtor were to obtain funding). Similar relief is routinely grated in this district.

25. The Debtor's liquidity needs can be satisfied only if the Debtor is authorized to continue borrowing under the Loan and Security Agreement and to use such proceeds to fund its operations. The Debtor has been unable to procure sufficient financing in the form of unsecured credit allowable under Section 503(b)(1), as an administrative expense under Section 364(a) or

(b), or in exchange for the grant of a superpriority administrative expense claim pursuant to Section 364(c)(1). The Debtor has not been able to obtain post-petition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein. Accordingly, the Debtor submits that the circumstances of this case require the Debtor to obtain financing pursuant to Section 364(c) of the Bankruptcy Code and, accordingly, incurring post-petition debt pursuant to the Loan and Security Agreement reflects the exercise of its sound business judgment.

26. The terms and conditions of the Loan and Security Agreement are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length. Accordingly, the Lender and all obligations incurred under the Loan and Security Agreement should be accorded the benefits of Section 364(e) of the Bankruptcy Code.

## THE USE OF CASH COLLATERAL SHOULD BE APPROVED

27. Under Section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use ... in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Debtor requires the use of Cash Collateral to fund its ongoing operations. The interests of the Lender in the Cash Collateral will be protected by the adequate protection set forth above. Moreover, the Debtor understands that the Lender will consent to the use of Cash Collateral on the terms set forth herein and in the Interim Order. Accordingly, the Debtor's request to use Cash Collateral should be approved.

## THE PROPOSED ADEQUATE PROTECTION SHOULD BE AUTHORIZED

28. Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used ... or proposed to be used ..., the court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code sets forth the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. *See In re O 'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained pre-bankruptcy.") (internal citation omitted).

29. The Lender will agree to the Debtor's use of Cash Collateral in consideration for the adequate protection provided in the Interim Order. Accordingly, the adequate protection proposed herein to protect the Lender's interest in the Cash Collateral is fair and reasonable and sufficient to satisfy the requirements of Sections 363(c)(2) and (e) of the Bankruptcy Code.

## INTERIM APPROVAL SHOULD BE GRANTED

30. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral

and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

31. Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtor requests that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtor to use Cash Collateral and borrow under the Loan and Security Agreement on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of the Debtor, and (ii) avoid immediate and irreparable harm and prejudice to the Debtor's estate and all parties in interest, and (b) schedule a hearing to consider entry of a Final Order.

32. The Debtor has an immediate need for cash to continue to operate. Currently, the Debtor does not have sufficient funds with which to operate its business on an ongoing basis. Absent authorization from the Court to obtain secured credit and use cash collateral, as requested, on an interim basis pending a final hearing on the Motion, the Debtor will be unable to pay certain critical providers and maintain clinical trials that are critical to maintaining the value of the Debtor's assets. The availability of Cash Collateral and interim financing are the only means available to the Debtor to pay these critical obligations. The interim relief requested is therefore critical to preserving and maintaining the value of the Debtor assets.

33. The Debtor submits that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth herein, Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") has been satisfied.

34. To implement the foregoing, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay under Bankruptcy Rule 6004(h).

## NOTICE

35. Notice of this Motion has been served on (i) the Office of the United States Trustee for the District of Delaware; (ii) each of the Debtor's twenty largest unsecured creditors and/or their counsel; (iii) counsel for SCP Vitalife Partners II, L.P.; (iv) counsel for Silicon Valley Bank; (v) counsel for Safeguard Delaware, Inc.; (vi) the United States Department of Justice; (vii) the Internal Revenue Service, and (viii) the United States Environmental Protection Agency. Notice of the Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Debtor respectfully requests that this Honorable Court enter an order, substantially in the form attached hereto as Exhibit C, granting the relief requested herein and such other and further relief as is just.

Date: December 30, 2010
Wilmington, Delaware

SULLIVAN • HAZELTINE • ALLINSON LLC

*/s/ William A. Hazeltine*
William A. Hazeltine (No. 3294)
4 East 8th Street, Suite 400
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195

*Proposed Attorneys for the Debtor and Debtor-in-Possession*