UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

Garnet BioTherapeutics, Inc.,

        Debtor.

Chapter 11

Case No. 10-14165 (BLS)

**DISCLOSURE STATEMENT FOR <u>FIRST AMENDED</u> PLAN OF ~~REORGANIZATION~~ <u>REORGANIZATION</u> OF GARNET BIOTHERAPEUTICS, INC.**

Date:  ~~March 2~~<u>April 5</u>, 2011
       Wilmington, Delaware

**SULLIVAN • HAZELTINE • ALLINSON LLC**
William A. Hazeltine (No. 3294)
901 North Market, Suite 1300
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195

Attorneys for the Debtor and Debtor-in-Possession

<u>NOTICE</u>

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT <u>AUTHORIZED</u> <u>BY THE BANKRUPTCY COURT</u> THAT CREDITORS AND HOLDERS OF EQUITY INTERESTS SHOULD CONSIDER IN CONNECTION WITH SOLICITATION OF VOTES ON THE <u>FIRST AMENDED</u> PLAN OF REORGANIZATION OF GARNET BIOTHERAPEUTICS, INC. (the "PLAN").[1]

NO REPRESENTATIONS HAVE BEEN AUTHORIZED<u> BY THE</u> <u>BANKRUPTCY COURT</u> CONCERNING THE DEBTOR, ITS ASSETS, OR CLAIMS AGAINST THE DEBTOR EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN.

ACCORDINGLY, CREDITORS AND HOLDERS OF EQUITY INTERESTS SHOULD NOT RELY ON ANYTHING OTHER THAN THE REPRESENTATIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND IN THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IN CONSIDERING WHETHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION AS THAT TERM IS USED IN SECTION 1125 OF THE BANKRUPTCY CODE. THE BANKRUPTCY COURT WILL CONSIDER APPROVAL OF THE DISCLOSURE STATEMENT AT A HEARING SCHEDULED FOR APRIL 6, 2011, AT 10:00 A.M. (PREVAILING EASTERN TIME)~~, AT WHICH TIME THE BANKRUPTCY COURT ALSO WILL CONSIDER CONFIRMATION OF THE PLAN.~~<u>).</u>

THE PLAN PROPONENTS URGE YOU TO READ THIS DISCLOSURE STATEMENT BECAUSE IT CONTAINS A SUMMARY OF THE PLAN, IMPORTANT INFORMATION CONCERNING THE DEBTOR'S HISTORY AND OPERATIONS, CLAIMS AGAINST THE DEBTOR, AND HOW CLAIMS WILL BE TREATED IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT.

THE DISCLOSURE STATEMENT ALSO PROVIDES INFORMATION REGARDING ALTERNATIVES TO THE PLAN. A COPY OF THE PLAN IS ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT A</u>.

THE DESCRIPTION OF THE PLAN IN THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OF THE PLAN. THE PLAN SHOULD BE READ CAREFULLY AND INDEPENDENTLY OF THIS DISCLOSURE STATEMENT.

---

[1] Unless otherwise defined in this Disclosure Statement, all capitalized terms used but not defined herein have the meanings given to them in the Plan.

YOU ALSO SHOULD CONSIDER CONSULTING WITH YOUR OWN COUNSEL AND OTHER ADVISORS IN CONNECTION WITH YOUR CLAIM(S) AGAINST OR EQUITY INTEREST(S) IN THE DEBTOR, THE TREATMENT TO BE AFFORDED TO YOUR CLAIM(S) OR INTEREST(S) UNDER THE PLAN, AND ANY TAX CONSEQUENCES ATTENDANT TO CONFIRMATION OF THE PLAN.

PLAN PROPONENTS CANNOT REPRESENT OR WARRANT THAT THE INFORMATION HEREIN IS WITHOUT INACCURACY OR ERROR BUT IT IS THE MOST ACCURATE INFORMATION AVAILABLE TO THEM AT THIS TIME. NOTHING CONTAINED HEREIN IS AN ADMISSION OF ANY FACT OR LIABILITY NOR SHALL IT BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE PLAN PROPONENTS.

NO REPRESENTATIONS BY ANY PERSON CONCERNING THE DEBTOR (PARTICULARLY AS TO ITS BUSINESS OPERATIONS OR THE VALUE OF ITS ASSETS) ARE AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION TO ACCEPT OR TO REJECT THE PLAN.

## I.

## THE PLAN PROPONENTS' PRELIMINARY STATEMENT AND SOLICITATION

This Disclosure Statement is being distributed to all Creditors of and holders of Equity Interests in the Debtor pursuant to 11 U.S.C. § 1125. It relates to the Plan, which was filed by Debtor with the Bankruptcy Court on ~~March 2~~April 5, 2011.

You should take the time to vote on the Plan which, if confirmed, will affect your economic interest. Before casting your ballot, it is important that you be informed about the nature of the Chapter 11 Case, the Plan and its consequences. The Plan Proponents believe that this Disclosure Statement contains adequate information to enable you to make an informed decision about the Plan. The Plan Proponents urge you to review the Disclosure Statement and Plan, and consult with your own legal counsel, accountants, tax advisors, financial advisors and/or other advisers. The Plan Proponents also urge you, for the reasons which follow, to vote in favor of the Plan.

The Plan Proponents generally believe that creditors should be paid in full by a debtor. Unfortunately, bankruptcy results, as it did in this case, when it becomes difficult or impossible for a business to pay its debts in full when due.

Both the Chapter 11 Case and the Plan are somewhat complex. You should read this Disclosure Statement and the Plan before you decide how to vote. The purpose of the Disclosure Statement is to provide sufficient information to enable Creditors entitled to vote to make an informed decision on whether to accept or reject the Plan. All information in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan. However, if there are any inconsistencies between the Plan and the descriptions in the Disclosure Statement, the terms of

the Plan govern. This Disclosure Statement and the Plan are the only materials creditors should use to determine whether to vote to accept or reject the Plan.

> **The deadline for Ballots casting votes to accept or reject the Plan is** ~~**March 30,**~~**May____, 2011 at 4:00 p.m. (prevailing Eastern Time).**
> **To be counted, your Ballot must actually be received by this date and time.**

> **The *record holder* date for determining which Creditors may vote on the Plan is March 2, 2011.**

The Plan Proponents believe that Confirmation of the Plan is in the best interests of the Debtor's Creditors.

A summary of the treatment afforded to Creditors with Claims in Classes provided for by the Plan is set forth below:

| Class | Treatment[2] | Anticipated Recovery Under the Plan | Anticipated Recovery in Chapter 7 Liquidation |
|---|---|---|---|
| | | | ~~0~~ |
| 1 – Priority Claims | Payment in full in Cash | 100% | 0 |
| 2 -.Miscellaneous Secured Claims | Payment in full in Cash or reinstatement | 100% | 0 |
| 3 – SCP Secured Claim | Payment in full in Cash | 100% | From 0 to 100% |
| 4 – Sterne Kessler Secured Claim | Payment in full in Cash | 100% | 100% |
| 5 – Convenience Claims | Payment in Cash | 90% | 0 |
| 6 – General Unsecured Claims | Payment in Cash | 10% | 0 |
| 7 -. Critical Vendor Claims | Payment in Cash | 20% | 0 |
| 8 – Insider Unsecured Claims | Subordinated Note | Undeterminable at this time | 0 |
| 9 – Equity Interests | Cancellation | 0 | 0 |

---

[2] The descriptions of the treatment of classes of Claims and Equity Interests in this table are subject to the full descriptions included in the Plan and described herein.

> **RECOMMENDATION: THE PLAN PROPONENTS SUPPORT CONFIRMATION OF THE PLAN AND, ACCORDINGLY, THE PLAN PROPONENTS URGE HOLDERS OF CLAIMS ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.**

The Bankruptcy Code provides that only the Ballots of Creditors that actually vote on the Plan will be counted for purposes of determining whether the requisite acceptances have been attained. Failure to deliver a properly completed Ballot by the Voting Deadline will constitute an abstention (*i.e.*, will not be counted as either an acceptance or a rejection), and any improperly completed or late Ballot will not be counted.

## II.

## BACKGROUND

### A.  Introduction

Debtor is, and has always been, a developmental stage company. Debtor never has had any commercial revenue and instead has relied on investment capital and loans to fund its operations. In the latter half of 2010, Debtor's efforts at obtaining additional capital through investment or loans were not as successful as hoped and operational expenses were in excess of the funds available to Debtor, requiring the Debtor to seek relief through the provisions of the Bankruptcy Code. Debtor commenced this Chapter 11 Case so that it could maintain minimal operations while it restructures its debt and capital structure. Debtor believes that, after its debt restructuring through the chapter 11 process, it will emerge from bankruptcy, continue to develop its technology, and become a commercially viable company.

### B.  Debtor's Business

Since its inception in 2000, Debtor has been a developmental stage biopharmaceutical company.

Debtor is in the process of developing a unique cellular therapy with the potential to significantly improve the treatment of numerous diseases. This therapy, comprised of human adult bone marrow-derived somatic cells, is designed to supplement and stimulate the body's natural repair mechanism when it is overwhelmed by illness or injury. By promoting the repair and regeneration of damaged tissue, this investigational treatment also may have the potential to reverse or significantly modify the course of certain diseases, unlike existing therapies which may only slow or halt the progression of the disease.

Initially, the lead therapeutic interest was cardiac, which proved to be exceedingly costly and would have taken a long time to become a commercial reality. Debtor expended

approximately $45 million of prior investment funds over an eight year span (2000 – 2008) in pursuit of the cell development and cardiac interests.

In 2008, a new investor group determined that the technology developed to that time could be aimed at alternative areas of interest. Accordingly, a re-capitalization investment of $10.4 million was made in 2008 by the Plan Sponsors, Safeguard Delaware, Inc. ("**Safeguard**") and several -parties that previously had invested in Debtor. At this time Debtor's name was changed from Neuronyx, Inc. to Garnet BioTherapeutics, Inc. and new management focused Debtor's development and clinical efforts toward therapies for diseases in which there is significant unmet medical need. Debtor first intended to develop its cellular therapy in the treatment of post-surgical wound repair with a goal of providing significantly reduced scarring or 'scarless' healing in patients undergoing elective cosmetic surgeries. Debtor believed that it could reach the proof of concept milestone in 2010 with a commercial launch within approximately two years thereafter; but was unable to meet the milestone in 2010.

### C.    Research &Development Categories

In mid-year 2010, Debtor commenced discussions/negotiations with potential investors for additional funding in support of four business initiatives:

- Expanded clinical trial for efficacy in healing of incisional scars;

- Extension of the therapy technology to additional, less expensive to develop applications, *i.e.*, a cellular 'device' prototype for tendon repair and healing;

- Further development of an automated, improved method of cell production that lowers manufacturing costs and provides quicker timeframes for production; and

- In the above automated cell production process, equine cells were used to evaluate improvements in the cell manufacturing process (so as to not waste human cells); and, as a result of the equine cells proving to be prolific in the manufacturing optimization studies, Debtor began to investigate opportunities for veterinary use of these cells for animal injuries.

### C.    Debtor's Pre-Petition Capital Structure

Because of the developmental nature of Debtor's business, Debtor has not generated any commercial revenues to date. Therefore, continuation of Debtor's business activity is wholly dependent on securing adequate capital to allow a reorganization of Debtor's capital structure through the chapter 11 process and to provide working capital to meet Debtor's developmental business operation needs going forward.

Prior to the ~~Summer~~summer of 2010, Debtor had been funded through equity infusions by its three shareholders, the SCP Entities, the ATV Entities, and Safeguard. In the Summer of 2010, in anticipation of another financing/investment transaction expected to close in the Fall of 2010, the SCP Entities and the ATV Entities advanced unsecured demand loans to Debtor in the aggregate principal amount of $500,000 (the "**Bridge Loans**") to fund Debtor's continuing

operations and on-going working capital needs as of such time, but only for a short term period. The Bridge Loans, evidenced by the Bridge Notes, were made on or about July 29, 2010, and August 30, 2010.

In late September, 2010, certain of the participants in the potential investor group that were to provide additional funding to Debtor going forward (and after use of the proceeds of the Bridge Loans) expressed discord with Debtor's future business direction as well as the terms and conditions for a further financing transaction. Consequently, the proposed financing did not close, further exacerbating Debtor's precarious financial position. Because it lacked the funds to pay them, Debtor's employees were furloughed in early October 2010. Debtor's management and Board of Directors also then began to search for alternative sources of financing.

In early October 2010, Silicon Valley Bank was identified as a potential financing source and early on materialized as the only realistic source of financing for the Debtor. Silicon Valley Bank conducted due diligence with respect to Debtor and its operations for approximately two months before committing to lend.

In early December, 2010, Debtor obtained an $800,000 secured line of credit from Silicon Valley Bank (the "**Line of Credit**") consisting of two term loan tranches of $400,000 each ("**Term Loan A**" and "**Term Loan B**"). On or about December 15, 2010, Debtor drew the first $400,000 (Term Loan A). Term Loan B provides for additional advances of up to $400,000 in minimum increments of $100,000. As of the date hereof, Debtor has drawn $200,000 of the Term Loan B amount and anticipates drawing the remainder of Term Loan B prior to confirmation of the Plan.

To the best of its knowledge, aside from the a $15,000 retainer payment it made in December, 2010, to a law firm to secure its continued work, the Line of Credit is Debtor's only pre-Petition Date secured debt. The total amount owed on the Line of Credit as of the Petition Date was $400,000 plus minimal accrued interest.

The total amount owed on the Bridge Loans as of the Petition Date, including accrued interest, was approximately $524,000.

In addition, Debtor has approximately $1,700,000 of unsecured trade payables, accrued liabilities and other liabilities as of the Petition Date.

As of the Petition Date, Debtor had approximately $125,000 in its sole bank account.

## D.    Events Leading to Bankruptcy

Debtor is still in the developmental stage and has had no commercial revenues. Accordingly, the Company is wholly dependent on investor funds. As discussed above, the Company was in discussions with potential investors but those discussions broke down in late September, 2010, due to a disagreement over the future direction of the company. As a result, Debtor was in the process of soon exhausting exhausted all of its then available operating funds.

Without funds to operate, Debtor was forced to furlough its employees and also started to fall behind on its obligations, leading to increasing pressures as creditors escalated collection

efforts. By way of example, ~~one of~~ Debtor's landlords threatened a lock-out, certain construction vendors commenced prosecution of a mechanic's lien action in which they requested arbitration, and two former employees filed complaints for payment of unpaid wages and benefits.

Accordingly, Debtor filed for bankruptcy protection to give it the opportunity to restructure its debt and capital structure. This restructuring may involve the sale of certain of its business segments either during the bankruptcy process or following Debtor's emergence from bankruptcy.

## III.

## DEBTOR'S CHAPTER 11 CASE

### A. <u>The Commencement of the Chapter 11 Case</u>

On December 28, 2010 (the "**Petition Date**"), Debtor filed a voluntary petition for relief under Chapter 11.

### B. <u>First Day Motions and Hearing</u>

To enable Debtor to minimize any adverse effect of the commencement of the Chapter 11 Case on its business, the Debtor upon the Commencement Date requested from the Bankruptcy Court limited relief in certain "first day" motions (collectively, the "**First Day Pleadings**"). The First Day Pleadings sought relief, among other things, to: (a) obtain access to the remaining availability of its cash and senior secured line of credit to fund the operation of the business; (b) maintain employee confidence and morale; (c) maintain its existing bank account; and (d) establish certain administrative procedures to promote a smooth transition to chapter 11. The First Day Pleadings filed by Debtor were: (1) *Debtor's Motion for Order Authorizing Debtor to (A) Continue and Maintain Its Cash Management System and Existing Bank Account and (B) Continue Use of Existing Business Forms* (the "**Cash Management Motion**"); (2) *Motion of Debtor Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for an Order (I) Authorizing Payment of Pre-Petition Wages, Compensation, Payroll Taxes, and Employee Benefits and (II) Authorizing Debtor to Maintain ~~Their~~Its Existing Employee Programs* (the "**Employee Wage/Tax/Benefit Motion**"); and (3) *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, and 364 Pursuant to the Debtor's Pre-Petition Credit Agreement and (C) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363, and 364, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "**DIP Financing Motion**").

After filing the First Day Pleadings ~~debtor,~~ Debtor, in coordination with the United States Trustee, because it had only one bank account prior ~~to~~to the Commencement Date (with Silicon

Valley Bank) which it had decided to move to another banking institution, decided to with draw its Cash Management Motion.[3]

With respect to the Employee Wage/Tax/Benefit Motion, Debtor requested, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, that the Bankruptcy Court authorize the Debtor to pay (a) in its sole discretion, (i) all obligations related to Wages, (ii) all Payroll Taxes related to the Wages, (iii) all obligations related to its existing Health ~~plan~~Plan, and (iv) all costs with regard to services provided by its current employees during the pre-petition period and (b) maintain the Health Plan as it was in effect as of the Petition Date, and as it may be modified, amended, or supplemented from time to time in the ordinary course.

As of the Petition Date, Debtor employed 2 individuals. The continued operation of the Debtor's business as a going concern depends largely upon the retention of the services of these employees and the maintenance of employee morale and cooperation. Maintaining the Debtor's business as a going concern is critical to maximizing the value of the Debtor's assets. Consequently, Debtor, by the Employee Wage/Tax/Benefit Motion, recognized and advised the Bankruptcy Court that it was critical for Debtor to satisfy its employee related obligations and continue its ordinary course employee plans, policies, and programs in effect as of the Petition Date.[4] As revised by Debtor in connection with comments to the motion provided by the United States Trustee, the Bankruptcy Court granted the Employee Wage/Tax/Benefit Motion by its order of January 6, 2011 [Docket No. 17].

Debtor also requested entry of ~~interim~~Interim and Final Orders authorizing the Debtor (a) to obtain post petition financing pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code, ~~and~~ to utilize cash collateral pursuant to section 363 of the Bankruptcy Code subject to a grant of adequate protection to creditors with security interests in and to such cash collateral pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.[5]

## C. The DIP Financing Transaction

Prior to the Petition Date, Debtor shopped extensively for financing. In October, 2010, after it was unable to obtain additional equity funding, Debtor searched for, but was unable to obtain, financing on an unsecured basis. SVB was the only financial institution willing to lend to the Debtor, on a secured basis, and that was conditioned on obtaining a guarantee from one of the Debtor's shareholders, SCP. Debtor initially believed that SVB would be providing it with post-petition financing as well; but Debtor subsequently learned that SVB would not agree to

---

[3] Debtor's pre-Petition Date cash management system consisted of a single bank account with Silicon Valley Bank, which was opened in early December, 2010. Subsequent to the Petition Date, Debtor closed this account and opened a "debtor-in-possession" account, in accordance with the guidelines of the United States Trustee, with TD Bank.

[4] Debtor believed that, as of the Petition Date, it was current on all employee obligations with respect to its current (non-furloughed) employees through December 31, 2010. Nonetheless, out of an abundance of caution, Debtor requested authority to pay obligations owed to such current employees.

[5] Substantially all of the cash in its bank account as of the Petition Date was proceeds from Debtor's draw on the Line of Credit.

provide post-petition financing in the event of a bankruptcy filing and instead would require a buyout from SCP upon a bankruptcy filing. Debtor retained a broker with experience in arranging post-petition financing but the broker was unable to obtain any expression of interest from any party to provide post-petition financing to the Debtor. Accordingly, SCP agreed to take an assignment from SVB of the Line of Credit and also ~~to agree~~agreed to lend to Debtor from its own funds the remaining $400,000 in connection with Term Loan B on a post-petition basis pursuant to the terms outlined in the DIP Financing Motion. By its DIP Financing Orders the Bankruptcy Court approved both the assignment of SVB's rights under the Pre-Petition Loan Documents to SCP, including the adequate protection granted to SCP in connection with Debtor's post-petition use of cash collateral subject to SCP's liens and security interests, and the debtor-in-possession financing with SCP as DIP Lender under and pursuant to the terms of the DIP Financing Orders.

Because it has no operating revenue, Debtor has made additional draws on the Line of Credit ~~after~~in the amount of $200,000 since the Petition Date to fund its expenses through the bankruptcy process; and expects to draw the entire $400,000 available under Term Loan B by the time of the Confirmation Hearing.

### D. Other Events During the Chapter 11 Case

On January 20, 2011, the United States Trustee convened a meeting of creditors (the "**Formation Meeting**") for the purpose of organizing an official committee of unsecured creditors in this case under sections 1107 and 1108 of the Bankruptcy Code, to represent the collective interests of all unsecured creditors of the Estate. No unsecured creditors appeared at the Formation Meeting and no unsecured creditors otherwise expressed an interest in serving as a member of an official creditors' committee. As a result, an official committee of unsecured creditors has not been formed in this case.

By motions dated December 29, 2010~~,~~ and January 10, 2011 [Docket Nos. 5, 23 and 24] (the "**Rejection Motions**"), Debtor requested authority from the Bankruptcy Court to reject an unexpired lease of non-residential real property, an unexpired lease of personal property, and certain other Executory Contracts. By orders dated January ~~27~~25, 2011 [Docket Nos. 48, 51 and 52], the Bankruptcy Court granted ~~Debtor' motions~~the Rejection Motions and authorized ~~it~~Debtor to reject the Executory Contracts covered by the Rejection Motions.

By motions dated January 10, 2011 [Docket Nos. 20, 25 and 26] (the "**Retention Motions**"), Debtor requested authority from the Bankruptcy Court to retain and employ (i) Sullivan Hazeltine Allinson, LLP, as bankruptcy counsel, (ii) Scott Bailey, as interim Chief Financial Officer, and (iii) other professionals, as such had been and would be retained by Debtor in the ordinary course of Debtor's business. By orders dated January ~~27~~25, 2011 [Docket Nos. 49, 50 and 54], the Bankruptcy Court granted Debtor' Retention Motions.

### E. The Claim Bar Date and the Filing of Claims

By Order dated January 27, 2011, the Bankruptcy Court set a Bar Date for the filing of pre-petition Claims of March 2, 2011.

## TREATMENT OF CREDITORS AND
## INTEREST HOLDERS UNDER THE PLAN

### A. **The Plan governs treatment of Claims against and Equity Interests in the Estate.**

The Plan provides for the Plan Sponsors to provide $2,300,000 to fund payments to Creditors under the Plan, as generally described below, and to provide working capital for Debtor's post-Confirmation operations.

1. *Administrative Claims.*

Treatment. Unless the holder of an Administrative Expense Claim agrees to a different treatment, on or as soon after the Effective Date as is reasonably practicable under the circumstances in respect of an Allowed Administrative Expense Claim, or as soon as is reasonably practicable under the circumstances after issuance of a Final Order Allowing such Administrative Expense Claim, the holder of an Allowed Administrative Expense Claim shall receive Cash from the Reorganized Debtor in an amount equal to the amount of the Allowed Administrative Expense Claim.

Debtor anticipates that Administrative Expense Claims together with Priority Tax Claims, Professional Fee Claims, and United States Trustee Fees will not exceed $100,000.00.

2. *Priority Tax Claims.*

Treatment. Unless the holder of a Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive from the Reorganized Debtor, at the option of the Reorganized Debtor as soon as is reasonably practicable after the later of the Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim: (i) Cash in an amount equal to such Allowed Priority Tax Claim; or (ii) deferred Cash payments in an aggregate principal amount equal to the amount of the Allowed Priority Tax Claim plus interest on the unpaid portion thereof at the applicable rate under non-bankruptcy law from the Effective Date through the date of payment thereof, which payments shall be made in equal annual installments starting on the first anniversary of the Petition Date and continuing annually thereafter to and including the fifth anniversary of the Petition Date. Any Claim or request for any penalty or penalty amount relating to any Priority Tax Claim (other than a penalty of the type specified in Section 507(a)(8)(G) of the Bankruptcy Code) is hereby Disallowed, and the holder of an Allowed Priority Tax Claim shall not assess or attempt to collect, and shall be enjoined by Confirmation from assessing or attempting to collect, such from the Estate, the Reorganized Debtor, or any of their respective Assets.

To the extent any Priority Tax Claim is asserted to be a Secured Claim, the Liens asserted by the holder of such Priority Tax Claim shall be extinguished upon payment in full of the Creditor's Allowed Priority Tax Claim. All payments made to a Creditor on account of such Creditor's Priority Tax Claim shall first be credited to the secured portion of the Claim.

Debtor anticipates that Administrative Expense Claims together with Priority Tax Claims, Professional Fee Claims, and United States Trustee Fees will not exceed $100,000.00.

3. *Professional Fee Claims.*

Treatment. Unless the holder of a Professional Fee Claim agrees to a different treatment, each holder of an Allowed Professional Fee Claim shall be paid in Cash in an amount equal to such Allowed Professional Fee Claim as soon as reasonably practicable after the first Business Day following the date upon which such Professional Fee Claim becomes an Allowed Claim by Final Order. All final applications for allowance and payment of Professional Fee Claims for time periods from the Petition Date through the Effective Date shall be filed by the Professional Fee Claims Bar Date. Any Professional Fee Claim that is not asserted in accordance with this Section 2.3.1 shall be deemed Disallowed under this Plan and the holder thereof shall be enjoined from commencing or continuing any Cause of Action to request Allowance of, collect, offset, recoup or otherwise recover such Professional Fee Claim against the Estate, the Reorganized Debtor, or any of their respective Assets.

Debtor anticipates that Administrative Expense Claims together with Priority Tax Claims, Professional Fee Claims, and United States Trustee Fees will not exceed $100,000.00.

No approval of the Bankruptcy Court shall be required with respect to compensation for fees and expenses of professionals of the Reorganized Debtor incurred after the Effective Date.

4. *DIP Claim.*

Except to the extent that the holder of the DIP Claim agrees to a different treatment, the DIP Claim shall be paid in full in Cash on the Effective Date.

Debtor anticipates that the amount of the DIP Claim as of the Confirmation Hearing will be $400,000 plus accrued interest.

5. *U.S. Trustee Fees.*

United States Trustee Fees incurred by the United States Trustee prior to the Effective Date shall be paid on the Effective Date, or as soon as is reasonable practicable after the Effective Date, or otherwise in accordance with the applicable schedule for payment of such fees. Until the Chapter 11 Case is closed by entry of a Final Order of the Bankruptcy Court, Reorganized Debtor shall pay all additional United States Trustee Fees incurred in accordance with the applicable schedule for the payment of such fees.

Debtor anticipates that Administrative Expense Claims together with Priority Tax Claims, Professional Fee Claims, and United States Trustee Fees will not exceed $100,000.00.

## B. **Description and Impairment of Classified Claims**

1. *Class 1 – Priority Claims:*

Class 1 consists of all Allowed Priority Claims under Section 507 of the Bankruptcy Code other than Administrative Claims, Professional Fee Claims, the DIP Claim, or Priority Tax Claims. Class 1 Claims are not Impaired by the Plan.

Treatment. To the extent a Priority Claim is or becomes an Allowed Priority Claim, and unless the holder of the Priority Claim agrees to a different treatment, each holder of an Allowed Class 1 ~~Claims~~Claim shall be paid in full in Cash by the Reorganized Debtor as soon as practicable after the Effective Date if such Claim is an Allowed Claim as of the Effective Date or within five (5) business days of such Claim becoming an Allowed Claim if such Claim is not an Allowed Claim as of the Effective Date.

Debtor anticipates that the aggregate amount of Class 1 Priority Claims will not exceed $70,000.00.

2. *Class 2 –. Miscellaneous Secured Claims*

Class 2 consists of any and all Claims, other than the DIP Claim, the Class 3 Secured Claim of SCP or the Class 4 Secured Claim of Sterne Kessler Goldstein & Fox, with respect to which the holder of the Claim asserts that the Claim is secured by a Lien against any Assets of the Debtor. Debtor does not believe there are any Class 2 Claims but has included the alternative treatment in section 3.2. of the Plan for any secured claims other than the secured Claims of SCP and Sterne Kessler that may be asserted and Allowed. Class 2 Claims are not Impaired and are deemed to have accepted this Plan.

Treatment. Each holder of ~~a~~an Allowed Class 2 Claim, at the option of Debtor (i) shall retain notwithstanding confirmation the legal, equitable and contractual rights (including, but not limited to, any Lien that secures such Allowed Class 2 Claim) to which the holder of such Allowed Class 2 Claim is entitled under applicable non-bankruptcy law, and Debtor shall cure any default existing in connection with such Allowed Class 2 Claim on or as soon after the Effective Date as is reasonably practicable under the circumstances, or (ii) the holder of each such Allowed Class 2 Claim will be paid in full in Cash on the later of (x) as soon as is practicable after the Effective Date if the Claim is an Allowed Claim as of the Effective Date, (y) as soon as is practicable after the date the Claim becomes an Allowed Claim, or (z) as soon as is practicable after the date the Claim becomes due and payable by its terms.

Class 2 Claims are not Impaired by the Plan.

Debtor does not believe there are any valid Class 2 Claims; but has included this possible Class of Claims out of an abundance of caution and to ensure proper treatment of any such Claims, if filed, that become Allowed.

### 3. *Secured Claim of SCP*

Class 3 consists of the Secured Claim of SCP, in connection with the Pre-Petition Loan Documents as assignee of SVB's rights thereunder pursuant to the SVB Assignment.

Treatment. On the Effective Date or as soon as practicable after the Effective Date, SCP shall receive payment in full in cash in full satisfaction of its Class 3 Secured Claim.

The Class 3 Claim is Impaired by the Plan.

Debtor anticipates that the Class 3 Secured Claim of SCP will be $400,000.00 plus accrued interest, fees and costs as may be provided by the Pre-Petition Loan Documents.

### 4. *Secured Claim of Sterne Kessler Goldstein & Fox*

Class 4 shall consist of the Secured Claim of Sterne Kessler Goldstein & Fox in respect of its in respect of its work performed as intellectual property counsel for the Debtor following its receipt of a $15,000.00 retainer (the ""**Retainer**"") from the Debtor on December 15, 2010.

Treatment. As soon as practicable after the Effective Date, if its Claim has become an Allowed Claim by the Effective Date, or upon Allowance of the Claim, Sterne Kessler Goldstein & Fox shall be entitled to apply the Retainer to its Allowed Claim to the full extent of its Allowed Claim.

The Class 4 Claim is Impaired by the Plan.

Debtor anticipates that the Class 4 Secured Claim of Sterne Kessler Goldstein & Fox will be $15,000.00.

### 5. *Class 5 – Convenience Claims*

Class 5 shall consist of the Claims of (i) the Creditors holding General Unsecured Claims against the Debtor in an amount not in excess of $500.00, and (ii) any Creditor holding a General Unsecured Claim against the Debtor in any amount that elects treatment of its Claim as a Class 4 Convenience Claim on the Ballot it returns in connection with the Plan. Any Creditor that elects treatment of its Claim as a Class 5 Claim pursuant to clause (ii) above shall be deemed to have consented to the reduction of the amount of its Claim to $500.00.

Treatment. Each holder of an Allowed Class 5 Claim shall receive, in full satisfaction of the Claim, a Distribution equal to 90% of the Allowed Amount of the Class 5 Claim, but with such distribution not exceeding $450.00 for any Creditor electing treatment of its Claim as a Class 5 Claim. Such distributions shall be made as soon as practicable after the Effective Date if the Class 5 Claim is an Allowed Claim as of the Effective Date or within five (5) business days of such Claim becoming an Allowed Claim if such Claim is not an Allowed Claim as of the Effective Date.

Class 5 Claims are Impaired Claims under the Plan.

Debtor anticipates that the Class 5 Claims in the aggregate could be, depending on elections made by Creditors eligible to become Class 5 Creditors, in a range from $5,000.00 to $~~58,500~~57,840.00.

6. *Class 6 – General Unsecured Claims:*

Class 6 shall consist of the Claims of those creditors holding General Unsecured Claims against the Debtor not included in any other Class of Claims.

Treatment. Each holder of an Allowed Class 6 Claim shall receive a Distribution equal to its pro rata share of the Class 6 Distribution Amount not to exceed ~~of up to~~ 10% of the Allowed Amount of such Class 6 Claim on the Distribution Date.

Class 6 Claims are Impaired by the Plan.

Debtor anticipates that the Class 6 Claims in the aggregate could be, depending on elections made by Creditors eligible to become Class 5 Creditors, in a range from $~~900~~1,213,000 to $~~963~~1,340,000.

7. *Class 7 – Critical Vendor Unsecured Claims:*

Class 7 shall consist of the Claims of those Creditors holding Critical Vendor Unsecured Claims against the Debtor. The holders of Critical Vendor Unsecured Claims are the Creditors identified on the schedule of Critical Vendor Unsecured Claims that will be filed with the Plan Supplement; and at this time Debtor anticipates such schedule including the following Creditors: Sterne Kessler Goldstein & Fox ("**Sterne Kessler**") (Debtor's intellectual property counsel), Fisher ~~Bio~~BioServices (which holds/stores certain of Debtor's stem cells), Wuxi Aptec (which holds/stores certain of Debtor's stem cells) and Malvern Consulting. The Debtor reserves the right to include additional Critical Vendors on the schedule of Critical Vendors in the Plan Supplement

Treatment. Each Allowed Class 7 Claim shall receive a Distribution equal to 20% of the Allowed Amount of the Class 7 Claim as soon as practicable after the Effective Date if such Claim is an Allowed Claim as of the Effective Date or within five (5) business days of such Claim becoming an Allowed Claim if such Claim is not an Allowed Claim as of the Effective Date.

The Debtor has classified Critical Vendors in a separate class and provided Critical Vendors with enhanced treatment because the Critical Vendors are vital to the ongoing operation and development of Debtor's business and would be difficult and costly to replace. Wuxi Apptec and Fisher BioServices maintain Debtor's cell colonies in cryogenic conditions. Loss of temperature or lack of monitoring of the cell colonies would result in death of the cells, which would be devastating to the Debtor's business. Sterne Kessler has been totally involved in the worldwide patent and trademark prosecution of various applications to protect the Debtor's intellectual property assets. Given Sterne Kessler's institutional knowledge of the Debtor's intellectual property assets, it would be extremely costly for another law firm to get up to speed so that it could represent the Debtor's interests effectively. In fact, replacing Sterne Kessler with another law firm could very well result in the Debtor missing important application deadlines.

Malvern Consulting is the "Party of Record" with the FDA on behalf of the Debtor in the Debtor's GBT clinical trial, Good Manufacturing Practices (as that term is used in the life science, pharmaceutical and biomedical industries) for the cells, safety monitoring and quality assurance. Accordingly, the Debtor could not comply with FDA regulations without Malvern Consulting.

Class 7 Claims are Impaired by the Plan.

The aggregate amount of the Class 7 Claims in the aggregate, as presently contemplated, is $831,408.00.

*8. Class 8 – Insider Unsecured Claims*

Class 8 shall consist of the prePre-Petition Date General Unsecured Claims of the SCP Entities and the ATV Entities against the Debtor in connection with the Bridge Notes.

Treatment. On the Effective Date or as soon as practicable after the Effective Date each holder of an Allowed Class 8 Claim shall receive a promissory note providing for the subordination of such claims to all other Claims payable under this Plan and to all Claims accrued after Confirmation, and with the notes convertible to equity in the Reorganized Debtor. The forms of the subordinated promissory notes that shall be issued to the holders of Class 8 Claims containing the terms thereof shall be filed with the Plan Supplement.

Class 8 Claims are Impaired by the Plan.

Debtor anticipates that the aggregate amount of the Class 8 Claims do not exceed $541,000.00.

*9. Class 9 – Equity Interests:*

Class 9 shall consist of the holders of Equity Interests of the stockholders of the Debtor. All Equity Interests in the Debtor shall be cancelled and will receive no Distributions under the Plan on account of their Equity Interests. Accordingly, Class 9 Equity Interests are impaired by the Plan; and, because they are to receive no Distribution under the Plan, are conclusively deemed to have voted to reject the Plan.

## C. Executory Contracts

Assumption or Rejection of Executory Contracts and Unexpired Leases. Effective on and as of the Effective Date, all Executory Contracts shall be deemed rejected, except for any Executory Contract (a) that already has been rejected pursuant to a Final Order of the Bankruptcy Court, (b) has been specifically assumed or assumed and assigned by the Debtor on or before the Effective Date pursuant to a Final Order of the Bankruptcy Court, (c) in respect of which a motion for assumption or assumption and assignment has been filed with the Bankruptcy Court on or before and remains pending as of the Effective Date, or (d) that is specifically designated in the Plan or in the Plan Supplement as an Executory Contract to be assumed or assumed and assigned by Debtor pursuant to Confirmation of the Plan.

Approval of Assumption or Rejection of Executory Contracts. With respect to the Executory Contracts designated in the Plan or in the Plan Supplement to be assumed by Debtor or to be assumed and assigned by Debtor, entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption or assumption and assignment of the Executory Contracts by Debtor. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the Executory Contracts that are to be rejected pursuant to the terms of Section 5.1 of the Plan.

Bar Date for Filing Proofs of Claim Relating to Executory Contracts Rejected Pursuant to the Plan. Claims against the Debtor arising out of the rejection of Executory Contracts must be filed with the Bankruptcy Court no later than the earlier of thirty (30) days after (i) any Final Order providing for the rejection of an Executory Contract if the Executory Contract is not rejected pursuant to Section 5.1 of the Plan, or (ii) the filing of a notice of occurrence of the Effective Date if the Executory Contract is rejected pursuant to Section 5.1 of the Plan. Any Claim in respect of an Executory Contract that is rejected by Final Order of the Bankruptcy Court or pursuant to Section 5.1 of the Plan that is not filed within the applicable time set forth above shall be forever barred from, and can then no longer be asserted against the Debtor, the Reorganized Debtor, or any of their respective Assets.

### D. Acceptance Or Rejection Of The Plan

Impaired Classes of Claims Entitled to Vote: Holders of claims in each Class identified as impaired in Article III of the Plan are entitled to vote as a Class to accept or reject the Plan. Accordingly, the holders of Claims in Classes 3, 4, 5, 6, 7 and 8 are entitled to vote either to accept or reject this Plan and all such holders are being solicited in accordance with the Bankruptcy Code, Bankruptcy Rules and applicable orders of the Bankruptcy Court.

Acceptance by an Impaired Class: In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, a Class of Claims entitled to vote to accept or reject the Plan shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan, without taking into account any votes of Insiders.

Presumed Acceptances by Unimpaired Classes: The holders of Claims in Classes 1 and 2, which are identified as not impaired in Article III of the Plan, are conclusively presumed, under section 1126(f) of the Bankruptcy Code, to accept the Plan. Thus, the votes of the holders of Class 1 and Class 2 Claims will not be solicited.

Presumed Rejection by Impaired Class 9: The holders of Class 9 Equity Interests, which are Class 9 Claims, will not receive anything under the Plan; and, accordingly, conclusively are presumed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Thus, the votes of the holders of Class 9 Equity Interests will not be solicited.

Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code: To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Plan Proponents request confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) of the Bankruptcy Code. The Plan Proponents reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Exhibit or Schedule, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

## E. Certain Conditions Precedent to the Confirmation Date

The following are conditions precedent to Confirmation of the Plan unless waived by the Plan Proponents pursuant to notice filed with the Bankruptcy Court:

(a)     The Plan Sponsor's Contribution shall have been made; and

(b)     Entry of the Confirmation Order in form and substance acceptable to the Plan Proponents.

## F. Certain Conditions Precedent to the Effective Date

The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived pursuant to notice filed by the Plan Proponents with the Bankruptcy Court:

(a) the Confirmation Date shall have occurred and the Confirmation Order, in a form consistent with the requirements of Section 9.1 of the Plan, shall have become a Final Order;

(b) all actions, documents and agreements necessary to implement the provisions of the Plan to be effectuated on or prior to the Effective Date shall be reasonably satisfactory to the Plan Proponents, and such actions, documents, and agreements shall have been effected or executed and delivered;

(c) at least $1,000,000.00 is available, after payment of Allowed Claims and provision is made for payment of Disputed Claims as provided for herein, from the Plan Sponsor's Contribution to fund Debtor's working capital needs after the Effective Date; and

(d) all other actions required by the Plan to occur on or before the Effective Date shall have occurred.

## G. Reservation of "Cram Down" Rights

The Bankruptcy Code permits the Bankruptcy Court to confirm a Chapter 11 plan over the dissent of any class of claims or equity interests as long as the standards in section 1129(b) of the Bankruptcy Code are met. This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the plan process. It assures that no single

group (or multiple groups) of claims or interests can block a plan that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Plan Proponents reserve the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by any classes entitled to vote. At the Confirmation Hearing, the Plan Proponents will seek a ruling that if no holder of a Claim or Equity Interest eligible to vote in a particular Class timely votes to accept or reject the Plan, the Plan will be deemed accepted by the holders of such Claims or Interests in such Class for the purposes of section 1129(b).

**V.**

**VOTING PROCEDURES AND REQUIREMENTS**

Detailed voting instructions are provided with the Ballot accompanying this Disclosure Statement. The Claims in Classes 3, 4, 5, 6, 7 and 8 are entitled to vote to accept or reject the Plan. You should read your Ballot and follow the instructions carefully. Please use only the Ballot that accompanies this Disclosure Statement.

### A. <u>Vote Required for Acceptance by a Class</u>

Under the Bankruptcy Code, acceptance of a Chapter 11 plan by a class of claims is determined by calculating the number and the amount of claims voting to accept, based on the actual total allowed claims voting. Acceptance requires an affirmative vote of more than one-half of the total allowed claims voting and two-thirds in amount of the total allowed claims voting in any given class.

### B. <u>Classes Not Entitled to Vote</u>

Under the Bankruptcy Code, Creditors and Equity Interest holders are not entitled to vote if their contractual rights are unimpaired by the Plan or if they will receive no Distributions under the Plan. Based on this standard the holders of Class 1 (Priority Claims), Class 2 (Miscellaneous Secured Claims) and Class 9 (Equity Interests) are not entitled to vote on the Plan. In addition, because Class 8 consists of the holders of Claims that also are shareholders of Debtor, and thus are insiders as such term is defined by the Bankruptcy Code, acceptance of the Plan by an impaired class of creditors will be determined without reference to whether Class 8 accepts the Plan.

### C. <u>Voting</u>

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE SUBMITTED TO SULLIVAN • HAZELTINE • ALLINSON LLC, AT THE ADDRESS LISTED BELOW, EITHER BY FIRST CLASS UNITED STATES MAIL, OVERNIGHT MAIL DELIVERY OR HAND-DELIVERY (NO EMAIL OR FAX DELIVERIES WILL BE COUNTED), SO THAT IT IS ACTUALLY RECEIVED ON OR BEFORE THE VOTING DEADLINE OF ~~MARCH 30,~~MAY ___, 2011, BY 4:00 P.M., PREVAILING EASTERN TIME, ~~ON~~BY:**

**SULLIVAN • HAZELTINE • ALLINSON LLC**
William A. Hazeltine
901 North Market, Suite 1300
Wilmington, DE 19801
Tel: (302) 428-8191

     If your Ballot is damaged or lost, you may contact Sullivan • Hazeltine • Allinson LLC at the number set forth above to obtain a replacement. Any Ballot that is executed and returned but which does not indicate an acceptance or rejection of the Plan will not be counted.

**VI.**

**IMPLEMENTATION OF THE PLAN**

## A. Plan Sponsor's Contribution and the Issuance of Reorganized Common Stock

     Debtor has analyzed the amount of funds and working capital that it will need to pay Claims as provided for under the Plan and to meet business operational needs after the Effective Date for a reasonable period of time thereafter (Debtor has forecasted its anticipated working capital needs for the remainder of year 2011 commencing April 1, 2011). Based on this analysis Debtor anticipates a need for in excess of $2,000,000. The Plan Sponsor's Contribution will be $2,300,000. The two participating SCP Entities shall contribute 80% of such amount, with the ATV Entities contributing the remaining 20%. The Plan Sponsor's Contribution shall be made by the Plan Sponsors on or before the Confirmation Date, in accordance with the terms of the Plan Support Agreement, in escrow with Debtor's counsel, pending Confirmation and the occurrence of the Effective Date. In return for the Plan Sponsor's Contribution, on the Effective Date, the Reorganized Debtor shall issue to the Plan Sponsors all of the Reorganized Common Stock. The SCP Entities shall receive 80% of the Reorganized Common Stock with the ATV Entities receiving the remaining 20% of the Reorganized Common Stock.

## B. Pre-Petition Sale/Marketing Efforts/Asset Valuation/Calculation of Plan Sponsors' Contribution

     As set forth earlier in this Disclosure Statement, prior to the commencement of the Chapter 11 Case, Debtor attempted to obtain financing through additional equity investments and/or loans to keep its operations going. Because Debtor is still in a developmental stage, its assets are not producing revenues and they have not yet been developed to extents that would facilitate advantageous sale opportunities. Nevertheless, given the anticipation in late 2009 and early 2010 of its impending cash flow problems and the reality of its severe cash flow problems in mid to late 2010, Debtor made efforts as described above to obtain such financing. Debtor also attempted to find buyers of some or all of its assets to deal with its cash flow and operational issues. Debtor's efforts to locate buyers of some or all of its assets continued up to the commencement of the Chapter 11 Case. No buyers at any price were found for any of Debtor's assets.

     The amount of the Plan Sponsors' Contribution was calculated taking into account the funds that would be needed (i) to fund payments in full to secured, priority and administrative creditors, (ii) to fund a reasonable dividend to unsecured creditors, and (iii) to provide Debtor

19

with necessary working capital going forward.  The Plan Sponsor's do not believe that the value of Debtor's assets if sold or the Debtor as a going concern is in excess of the amount of the Plan Sponsors' Contribution.

Debtor's Chief Executive Officer, Geraldine Henwood, has been involved in the biopharmaceutical industry for several years and has extensive experience in the development of cellular therapies.  Ms. Henwood also has been involved in the management of, and investment in, developmental companies other than Debtor, some of which also utilized biopharmaceutical technologies.  Ms. Henwood led Debtor's efforts at finding buyers for some or all of its assets.  Based on her experience in the biopharmaceutical industry and in the development of companies utilizing biopharmaceutical technologies, Ms. Henwood does not believe that Debtor's assets if sold would have a value in excess of the amount of the Plan Sponsors' Contribution.

Moreover, it is Debtor's business judgment, given its relatively recent efforts at obtaining investment capital and in attempting to sell some or all of Debtor's assets, that a post-petition auction process for the assets or for the opportunity to outbid the Plan Sponsors' Contribution would not be a good use of time or resources.  In connection with the development of the Plan, Debtor contacted Entities that previously had invested in the Debtor, or that had expressed some interest in investing in the Debtor, and also had contacted other Entities in the biopharmaceutical industry that might be interested in investing in the Debtor, in each case to give them an opportunity to participate in the Plan Sponsors' Contribution.  Safeguard also was approached.  No one other than the Plan Sponsors expressed any interest.  Debtor also believes that a post-petition auction process would involve substantial delay in resolution of the Chapter 11 Case, with the accrual of more operational loss; and that additional administrative expenses including, without limitation, retention of investment bankers, brokers and/or financial advisors to run a post-petition auction process, would be incurred as part of that process.

For all of these reasons Debtor believes that a post-petition auction process would be futile, costly, would not produce a buyer or investor willing to top the Plan Sponsors' Contribution, and would not provide any benefit to the estate.

## C.  OFFICERS AND DIRECTORS OF THE REORGANIZED DEBTOR

The officers and directors of the Reorganized Debtor will be identified in the Plan Supplement.

## B. D.  Payment of Claims; Reduction Of Distribution to Class 6 Claims

A portion of the Plan Sponsors' Contribution shall be used by Debtor to pay Claims as provided for under the Plan.  Debtor anticipates that funding of payments to be made on account of Allowed Claims as provided for by the Plan at the payment levels established by the Plan will leave Debtor with at least $1,000,000.00 for working capital needs after the Effective Date.

Based on its analysis of Claims, including Claims as included in Debtor's Schedules and Claims asserted in proofs of claim filed by Creditors to date, Debtor anticipates having sufficient funds remaining after (i) payment of Priority Tax Claims, Administrative Claims, Professional Fee Claims, United States Trustee Fees, the DIP Claim, and the Claims in Classes 1, 2, 3, 4, 5 and 7, and (ii) setting aside $1,000,000.00 from the Plan Sponsors' Contribution for post-

Confirmation working capital needs, to pay each <u>holder of an</u> Allowed Class 6 Claim a ~~10%~~ distribution~~.  In~~ <u>of between 7.5% and 10% of</u> the ~~event that sufficient funds are not available to pay a full 10% distribution, Debtor anticipates that the reduction in the distribution payable to~~<u>amount of such holder's</u> Allowed Class 6 ~~Claims will be a *de minimus* amount~~<u>Claim</u>.

It is a condition to the Effective Date that at least $1,000,000.00 be available, after payment of Allowed Claims and provision is made for payment of Disputed Claims as provided for by the Plan, from the Plan Sponsor's Contribution to fund Debtor's working capital needs after the Effective Date

## ~~C.~~ **E.  Cancellation and Return of Existing Securities, Notes, Instruments and Agreements**

On the Effective Date, except as otherwise provided for in the Plan, all securities, notes, instruments, and agreements governing any Claims or Interests impaired by the Plan will be deemed canceled and terminated, and the obligations of the Debtor relating to, arising under, in respect of or in connection with such securities, instruments, or agreements will be deemed released and/or satisfied as to the Debtor; *provided, however*, that except as otherwise provided herein, notes and other evidences of Claims against the Debtor will, upon the Effective Date, represent the right to participate in the Distributions contemplated by the Plan.

Each holder of a security, note, instrument, or agreement evidencing or securing an Impaired Claim or Equity Interest shall surrender the same to Reorganized Debtor and the holders of Claims based on any such security, note, instrument, or agreement shall receive the appropriate Distribution hereunder to which it may be entitled.  No Distribution hereunder shall be made to or on behalf of any such holder unless and until such security, note, instrument, or agreement is received by the Reorganized Debtor, or the unavailability of such security, note, instrument, or agreement is established to the satisfaction of the Reorganized Debtor.  Any such holder that fails (i) to surrender or cause to be surrendered such security, note, instrument, or agreement,~~or~~ (ii) to execute and deliver an affidavit of loss and indemnity satisfactory to the Reorganized Debtor, or (iii) in the event that the Reorganized Debtor so requests, fails to furnish a bond in form and substance (including, without limitation, with respect to amount) satisfactory to the Reorganized Debtor, as applicable, within six months after the Confirmation Date, shall be deemed to have forfeited any and all Claims it has or may have against the Debtor and shall not participate in any Distribution hereunder in respect of such Claims.  The forfeited Distribution, including (if applicable) interest accrued thereon, shall revert to the Reorganized Debtor. Notwithstanding the foregoing, all Claims against the Debtor relating to, arising under, in respect of, or in connection with such security, note, instrument, or agreement shall be released and/or deemed satisfied by this Plan and all Equity Interests shall be terminated to the extent provided herein regardless of whether and when any surrender, indemnity, or bond required by this section is provided, and regardless of whether a Distribution is made hereunder in the absence of compliance by any holder of a Claim with the requirements of this section.  The Reorganized Debtor in its sole and absolute discretion may waive the requirements of this section.

## ~~D.~~ F.  Disputed Claims

### 1. *Prosecution of Disputed Claims*:

Except as otherwise provided herein, the Reorganized Debtor shall have the right to object to Claims on any basis, including, without limitation, Claims that are not listed in the Schedules, that are listed therein as disputed, contingent, and/or unliquidated, or that are listed therein at a lesser amount than asserted by the Claimant.  Subject to further extension by the Bankruptcy Court for cause with or without notice, the Reorganized Debtor may object to any Claim up to 180 days after the Effective Date.  From and after the Effective Date, the Reorganized Debtor ~~Plan~~ shall succeed to all of the rights, defenses, offsets, and counterclaims of the Debtor in respect of all Claims and in that capacity shall have the exclusive power to prosecute, defend, compromise, settle, and otherwise deal with all such objections.

### 2. *Settlement of Disputed Claims and Interest*:

Pursuant to Bankruptcy Rule 9019(b), the Reorganized Debtor may settle any Disputed Claim (or aggregate of Claims if held by a single Creditor~~,~~) without notice, hearing or Bankruptcy Court approval.

### 3. *No Distributions Pending Allowance*:

Notwithstanding any provision in the Plan to the contrary, no partial payments and no partial distributions will be made by the Reorganized Debtor with respect to any portion of any Claim against Debtor if such Claim or any portion thereof is a Disputed Claim.  In the event and to the extent that a Claim against the Debtor becomes an Allowed Claim after the Effective Date, the holder of such Allowed Claim will receive the Distribution to which such holder is then entitled under the Plan.

## ~~E.~~ G.  Distributions

One of the key concepts under the Bankruptcy Code is that only claims that are "allowed" may receive distributions under a Chapter 11 plan.  This term is used throughout the Plan and Disclosure Statement.  In general, an "allowed" claim simply means that the Debtor agrees, or if there is a dispute, that the Bankruptcy Court determines, that the Claim, and the amount thereof, is a valid obligation of the Debtor.

Any Claim that has been listed by the Debtor in the Schedules, as may be amended from time to time, as liquidated in amount and not disputed or contingent is an Allowed Claim in the amount listed in the Schedules unless an objection to such Claim has been filed.  If the holder of such Claim files a proof of claim in an amount different than the amount set forth on the Schedules, the Claim is an Allowed Claim for the amount set forth on the proof of claim, unless an objection to such Claim has been filed.  Any Claim that has been listed in the Schedules as disputed, contingent, or not liquidated and for which a proof of claim has been filed is a Disputed Claim.  Any Claim for which an objection has been timely interposed is a Disputed Claim.

1. *Setoffs*

   The Reorganized Debtor retains all rights of set off and/or recoupment of the Debtor with respect to, and may, but will not be required to, assert rights of set off and/or recoupment against, any Claim asserted against the Debtor or the Reorganized Debtor. Any Distribution otherwise to be made pursuant to the Plan in respect of a Claim remains subject to the rights of the Reorganized Debtor to, assert rights of set off and/or recoupment. Neither the failure to assert rights of set off and/or recoupment nor the Allowance of any Claim against the Debtor hereunder shall constitute a waiver or release of any Claim the Debtor or the Reorganized Debtor may have against the holder of such Claim.

2. *Waiver of Subordination*

   The distributions under the Plan take into account the relative priority of each class in connection with any contractual subordination provisions relating thereto. Accordingly, the distributions under the Plan shall not be subject to levy, garnishment, attachment or other legal process by any holder of a Claim or Interest purporting to be entitled to the benefits of such contractual subordination.

## F. H.  Delivery of Distributions

   All distributions under this Plan on account of any Allowed Claim shall be made at the address of the holder of such Allowed Claim as set forth on the proof of claim filed by the holder of such claim, or on the Debtor's Schedules. if no proof of claim is filed. In the event that any Distribution to any holder is returned as undeliverable, the Reorganized Debtor shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Reorganized Debtor has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided, however,* that such undeliverable or unclaimed distributions shall be deemed Unclaimed Property at the expiration of one hundred eighty days from the date such distribution was originally made.

   All distributions provided for under the Plan will be indefeasible.

## G. I.  Nonconsensual Confirmation

   If any impaired Class of Claims entitled to vote will does not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Plan Proponents reserve the right to amend the Plan in accordance with Section 11.1 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. At the Confirmation Hearing, the Plan Proponents will seek a ruling that if no holder of a Claim or Equity Interest eligible to vote in a particular Class timely votes to accept or reject the Plan, the Plan will be deemed accepted by the holders of such Claims or Equity Interests in such Class for the purposes of section 1129(b).

## ~~H.~~ J.  Effect of Confirmation

### 1.  *Vesting of Assets*:

Except as otherwise expressly provided herein, on the Confirmation Date, all Assets of the Estate shall pass to and vest in the Reorganized Debtor as provided in the Plan free and clear of all Liens.

### 2.  *Injunction:*

Except as otherwise expressly provided herein including, without limitation, the treatment of Claims and Interests herein, the entry of the Confirmation Order shall, provided that the Effective Date shall have occurred, operate to enjoin permanently all Entities that have held, currently hold or may hold a Claim against Debtor, or who have held, currently hold or may hold an Equity Interest that is canceled and terminated pursuant to the Plan, from taking any of the following actions in respect of such Claim, or such Equity Interest:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against Debtor or the Reorganized Debtor, or their Assets; (b) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against either or both of the Debtor or the Reorganized Debtor, or their Assets; (c) creating, perfecting or enforcing in any manner, directly or indirectly, any lien or encumbrance of any kind against any or all of the Debtor or the Reorganized Debtor, or their Assets; (d) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any Claim, debt, liability or obligation due to the Debtor or the or the Reorganized Debtor, or their Assets; and (e) proceeding in any manner in any place whatsoever that does not conform to or comply with or is inconsistent with the provisions of the Plan.

### 3.  *Term of Injunctions or Stays*:

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the ~~Cases~~Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the later of (i) the Effective Date and (ii) the date indicated in such applicable order.

### 4.  *Exculpation:*

The Released Parties shall (a) not have or incur any liability to any person or entity for any act or omission in connection with the Chapter 11 ~~Cases~~Case and/or arising out of their formulation, implementation, confirmation, consummation or administration of the Plan (including solicitation or rejection thereof) or the treatment or administration of the property to be distributed under the Plan, except if such act or omission is determined in a Final Order to reflect bad faith or constitute gross negligence, willful misconduct or willful fraud, and (b) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan, and (c) shall be fully protected in acting or in refraining from acting in accordance with such advise; provided, however, that nothing contained herein shall

relieve any of the foregoing of any liability of any kind or nature related to any act or omission prior to the Petition Date.

5. *Releases*

Debtor shall unconditionally and forever release the Released Parties from all claims, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing on the Effective Date or thereafter arising in law, equity or otherwise that are based in whole or in ~~party~~part upon any act or omission, transaction, event, or other occurrence taking place on or after the Petition Date and before the Effective Date and in any way relating to the Debtor, the Chapter 11 ~~Cases~~Case or the Plan~~.~~ (the "**Released Claims**"). In furtherance of the foregoing, the Confirmation Order will constitute an injunction permanently enjoining the commencement or prosecution ~~by any entity, derivatively or otherwise, of any Claim, demand, debt, liability, Cause of Action, right, or Interest released and waived pursuant to the Plan the Released Parties~~of any Released Claims by the Reorganized Debtor or derivatively by any entity.

## ~~I.~~K.  Effect of No Confirmation

If the Plan is not confirmed for any reason, then (i) the Plan Sponsor's Contribution shall be released from escrow and returned to the Plan Sponsors, and (ii) the rights of all parties in interest in the Chapter 11 Case are and will be reserved in full. Any concession reflected or provision contained in the Plan, if any, is made for *purposes* of the Plan only, and if the Plan does not become effective, no party in interest in the Chapter 11 Case will be bound or deemed prejudiced by such concession.

## ~~J.~~L.  Miscellaneous Provisions

1. *Exemption from Transfer Taxes:*

Pursuant to Section 1146(a) of the Bankruptcy Code, the vesting of the Assets in the Reorganized Debtor and all of the respective Claims and Causes of Action arising therefrom and relating thereto; the issuance, transfer, or exchange of any security under the Plan; or the execution, delivery, or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan; or the vesting, transfer, or sale of any real property of ~~either of~~the ~~Debtors~~Debtor pursuant to, in implementation of or as contemplated by the Plan; shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

2. *Amendment or Modification of the Plan*:

The Plan Proponents may jointly alter, amend or modify the Plan pursuant to Section 1127 of the Code at any time prior to the Confirmation Date. After such time and prior

to substantial consummation of the Plan, the Plan Proponents may jointly, so long as the treatment of holders of Claims against the Debtor or Equity Interests under the Plan is not adversely affected, institute proceedings with the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and any other matters as may be necessary to carry out the purposes and effects of the Plan; *provided, however,* notice of such proceedings shall be served in accordance with Bankruptcy Rule 2002 or as the Bankruptcy Court shall otherwise order.

### 3. *Revocation or Withdrawal of the Plan:*

The Plan Proponents reserve the right to jointly revoke or withdraw the Plan at any time prior to the Effective Date. If the Plan Proponents jointly revoke or withdraw the Plan prior to the Effective Date, then the Plan shall be deemed null and void, and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

### 4. *Severability:*

In the event that any provision of the Plan is determined to be unenforceable, such determination shall not limit or affect the enforceability and operative effect of any other provisions of the Plan. To the extent that any provision of the Plan would, by its inclusion in the Plan, prevent or preclude the Bankruptcy Court from entering the Confirmation Order, the Bankruptcy Court, on the request of the Plan Proponents, may modify or amend such provision, in whole or in part, as necessary to cure any defect or remove any impediment to the Confirmation of the Plan existing by reason of such provision; *provided, however,* that such modification shall comply with the requirements of the Bankruptcy Code.

### 5. *Substantial Consummation:*

Upon the Effective Date, the Plan will be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 6. *Governing Law:*

Except to the extent the Bankruptcy Code, the Bankruptcy Rules, or other federal laws are applicable, the laws of the State of Delaware will govern the construction and implementation of the Plan and all rights and obligations arising under the Plan.

### 7. *Binding Effect:*

The provisions of the Plan will bind all holders of Claims against and Equity Interests in the Debtor, whether or not they have accepted the Plan.

# VII.

## CERTAIN FACTORS TO BE CONSIDERED

### A. Certain Bankruptcy Considerations

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

The Bankruptcy Court may confirm the Plan if at least one impaired class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class). Thus, for the Plan to be confirmed, one Impaired Class must vote to accept the Plan. As to each Impaired Class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these classes. The Plan Proponents believe that the Plan satisfies these requirements.

### B. Risks Relating to Recoveries under the Plan

There are various risk factors that may affect recoveries under the Plan. Among such factors are a risk that the Plan might not be consummated, risk associated with an unfavorable outcome of legal matters and risk of recovery dilution by Disputed Claims becoming Allowed Claims.

# VIII.

## CONFIRMATION OF THE PLAN

### A. ~~Hearing on the Adequacy of the Disclosure Statement and~~ Confirmation of the Plan

Section ~~1125(b~~ 1128(a) of the ~~Bankruptcy~~ Code requires that the ~~Bankruptcy Court, after notice and a hearing, approve a disclosure statement as containing adequate information. Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy~~ Court, after appropriate notice, hold a hearing on confirmation of a plan of reorganization. ~~Section 1125(f)(3)(C) of the Bankruptcy Code provides that, in a small business case such as the Chapter 11 Case, the hearing on the disclosure statement may be combined with the hearing on~~ The confirmation ~~of the Plan.~~

~~Pursuant to Sections 1125(b), 1125(f)(3)(C) and 1128(a) of the Bankruptcy Code, the hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan (the "Hearing")~~ hearing is scheduled for ~~April 6, 2011, at 10:00 a.m.~~ (prevailing Eastern Time~~),~~) on May ___, 2011, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, Courtroom ~~No.~~ 1, 824 Market Street, 6th Floor, Wilmington, Delaware 19801. The ~~Confirmation Hearing~~confirmation hearing may be adjourned from time to time by the ~~Bankruptcy~~ Court without further notice

except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization. Any objection to ~~approval of the Disclosure Statement and/or~~ confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of claims or interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds ~~therefor~~therefore, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon and received no later than 4:00 p.m. prevailing Eastern Time on ~~March 30,~~May ___, 2011, by (i) Sullivan • Hazeltine • Allinson LLC, Attorneys for Debtor, 901 North Market, Suite 1300, Wilmington, DE 19801, Attn: William A. Hazeltine, (ii) Stevens & Lee, P.C., Attorneys for the Plan Sponsors, 1105 N. Market Street, 7th Floor, Wilmington, DE 19801, Attn: John D. Demmy, Esq.; and (iii) The Office of the United States Trustee, 844 King Street, Wilmington, DE 19801, Attn: Jane Leamy, Esq.

**UNLESS AN OBJECTION TO ~~APPROVAL OF THE DISCLOSURE STATEMENT AND/OR~~ CONFIRMATION OF THE PLAN IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### B. General Requirements of Section 1129

Section 1129 of the Bankruptcy Code sets forth the requirements that must be satisfied for the Plan to be confirmed. Among other things, this section requires that the Plan (i) comply with the applicable provisions of the Bankruptcy Code; (ii) be proposed in good faith and not by any means forbidden by law; (iii) be accepted by each Impaired Class (subject to the "cram down" provisions in section 1129(b) of the Bankruptcy Code; and (iv) not be followed by the liquidation, or the need for further reorganization, of the Debtor.

The Plan Proponents believe that the Plan satisfies, or will satisfy, all of the statutory requirements for confirmation of the Plan. Before the Confirmation Hearing, the Plan Proponents may be required to submit extensive pleadings demonstrating that the Plan complies with all of the provisions set forth above. The following sections discuss some of the requirements set forth in section 1129(a) of the Bankruptcy Code.

### C. Best Interests Tests/Liquidation Analysis

As described above, section 1129(a)(7)(A) of the Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Chapter 7 is that portion of the Bankruptcy Code under which a debtor's estate is liquidated under the control of an independent trustee. In the typical case, a Chapter 7 debtor ceases business operations, and the Chapter 7 trustee liquidates the assets of a debtor's estate.

To determine the value that a holder of a Claim or Equity Interest in an impaired Class would receive if Debtor was liquidated under Chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of Debtor's assets if

the Chapter 11 Case was converted to a Chapter 7 liquidation case and Debtor's assets were liquidated by a Chapter 7 trustee ("**Liquidation Value**"). The Liquidation Value would consist of the net proceeds from the disposition of Debtor's assets, augmented by cash held by the Debtor and reduced by certain increased costs and Claims that arise in a Chapter 7 liquidation case that do not arise in a Chapter 11 case.

In this Chapter 11 Case, the Estate consists primarily of Cash, intellectual property Assets and Causes of Action.

The Plan Proponents believe that the "best interests" test is satisfied here for the following reasons:

1. All of Debtor's Assets are encumbered by Liens in favor of SCP, either in its capacity as Class 4 Secured Creditor or as DIP Lender, pursuant to the Bankruptcy Court's DIP Financing Orders. Thus, SCP's Secured Claim and the DIP Claim, in the aggregate amount of $800,000, plus interest, fees and costs as Allowed under and pursuant to the Pre-Petition Loan Documents and the DIP Financing Orders would have to be paid before payments could be made to other Creditors.

2. Debtor believes that the value of its Assets if liquidated in Chapter 7 likely would be insufficient to pay the Class 4 Claim of SCP and the DIP Claim in full.

3. The Plan Sponsors are willing to make the Plan Sponsor's Contribution, of $2,300,000.00, only in the context of the Chapter 11 Case and would not make the Plan ~~Sponsor's~~Sponsors' Contribution if the Chapter 11 Case was converted to a Chapter 7 liquidation case. Thus, Debtor's Estate would not have Plan Sponsor's Contribution if the Chapter 11 Case was converted to a Chapter 7 liquidation case.

4. Debtor does not believe that it has any Causes of Action that a Chapter 7 Trustee might seek to pursue upon a conversion of the Chapter 11 Case. If it had any Causes of Action, Debtor believes such would be of *de minimus* value, if any value, in light of litigation and other costs that would be associated with the pursuit of any Causes of Action.

5. The Plan Proponents believe that the expenses of administration of the Chapter 11 Case will be equal to or less than those that would be incurred in a Chapter 7 liquidation. One factor in this determination is that a Chapter 7 trustee and his or her professionals would be required to spend significant time and incur the attendant expense necessary to learn all that would be required to learn about the Debtor and the Chapter 11 Case as a precursor to administration of the case in Chapter 7 or the pursuit of any Cause of Action

Debtor also has prepared a liquidation analysis, which is attached to this Disclosure Statement as Exhibit B. Consistent with the "best interests" discussion set forth above, the liquidation analysis shows that no Creditors other than SCP would receive any distribution on account of its Claim if Debtor were liquidated in a Chapter 7 liquidation case.

For the reasons set forth above, the Plan Proponents believe that, in a Chapter 7, the no holders of Claims other than SCP would receive any distribution on account of their Claims in a Chapter 7 liquidation; and that the only distribution they will receive is as provided for in the Plan. Accordingly, the Plan meets the Best Interest Test.

## D. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation should not be likely to be followed by the liquidation, or need for further financial reorganization, of the Debtors or any successor to the Debtor (unless such liquidation or reorganization is proposed in the relevant plan). Attached hereto as Exhibit C is a projection of the Debtor's operations post-Confirmation through the end of 2011. Debtor submits that such projection demonstrates the feasibility required by section 1129(a)(11) of the Bankruptcy Code.

## E. Section 1129(b)

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of Claims has accepted it. The process by which non-accepting classes are forced to be bound by the terms of the plan is commonly referred to as "cram down." The Bankruptcy Court may confirm the Plan at the request of the Plan Proponents notwithstanding the Plan's rejection (or deemed rejection) by impaired classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (l)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under Clause (1) or (2) of this paragraph or (3) for the realization of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (l) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides: (1) that each holder of an interest included in the rejecting class receive or retain on

account of that interest property that has a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such class will not receive or retain under the plan on account of such junior interest any property at all.

Plan Proponents believe that th Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code and intend to request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## VIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THIS PLAN

### F. Liquidation under Chapter 7

If no Chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effect that a Chapter 7 liquidation would have on the recoveries of holders of Claims is set forth in Section VII.C of this Disclosure Statement. The Plan Proponents believe that liquidation under Chapter 7 would result in smaller distributions being made to holders of Allowed Claims and no distributions to equity holders because of (a) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (b) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation.

### G. Alternative Plan of Reorganization

If the Plan is not confirmed, the Plan Proponents or any other party in interest could attempt to formulate a different plan under Chapter 11 of the Bankruptcy Code. The Plan Proponents have concluded that the Plan enables Creditors to realize the most value under the circumstances. If the Plan is rejected, it is possible that an alternative Chapter 11 plan could be proposed; it is likely, however, that such a plan would involve further negotiations and formulation, thereby increasing administrative expenses and reducing Creditor distributions. In the event the Plan is not confirmed, the statements contained herein shall not be deemed to have been admissions by any Plan Proponent that may be introduced into evidence against such Plan Proponent.

## IX.

## TAX CONSEQUENCES OF THE PLAN

**TO ENSURE COMPLIANCE WITH U.S. TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF UNITED STATES FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED UPON, BY HOLDERS OF**

CLAIMS OR ANY OTHER PERSONS FOR THE PURPOSE OF AVOIDING
PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS OR ANY OTHER
PERSONS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS
INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING
(WITHIN THE MEANING OF U.S. TREASURY DEPARTMENT CIRCULAR 230) OF
THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF
CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR
CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER.

## A. Introduction

The following discussion summarizes certain material U.S. federal income tax
consequences of the Plan to the Debtor and holders of Claims. The summary is provided for
general informational purposes only and is based on the Internal Revenue Code of 1986, as
amended (the "Tax Code"), the treasury regulations promulgated thereunder, judicial authority
and current administrative rulings and practice, all as in effect as of the date hereof and all of
which are subject to change, possibly with retroactive effect. Changes in any of these authorities
or in their interpretation could cause the United States federal income tax consequences of the
Plan to differ materially from the consequences described below. The United States federal
income tax consequences of the Plan are complex and in important respects uncertain. No ruling
has been requested from the Internal Revenue Service; no opinion has been requested from
Debtors' counsel concerning any tax consequence of the Plan; and no tax opinion is given by this
Disclosure Statement.

The following discussion does not address all aspects of federal income taxation that may
be relevant to a particular holder of a Claim in light of its particular facts and circumstances or to
particular types of holders of Claims subject to special treatment under the Tax Code. For
example, the discussion does not address issues of special concern to financial institutions,
insurance companies, tax-exempt organizations, broker-dealers or other dealers in securities, or
foreign (non-U.S.) persons, nor does it address any aspects of state, local, or foreign (non-U.S.)
taxation, or the taxation of holders of Interests in the Debtor. In addition, a substantial amount of
time may elapse between the Confirmation Date and the receipt of a final distribution under the
Plan. Events subsequent to the date of this Disclosure Statement, such as the enactment of
additional tax legislation, court decisions or administrative changes, could affect the federal
income tax consequences of the Plan and the transactions contemplated thereunder.

THE DISCUSSION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX
PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL
CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. EACH
HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH ITS TAX
ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX
CONSEQUENCES OF THE PLAN.

## B. Information Reporting and Withholding

Under the Tax Code's backup withholding rules, the holder of an Allowed Claim may be
subject to backup withholding with respect to allocations, distributions or payments made

pursuant to the Plan unless the holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Holders of Allowed Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

## C. Importance of Obtaining Professional Tax Assistance

The foregoing discussion is intended only as a summary of certain U.S. federal income tax consequences of the Plan, and is not a substitute for careful tax planning with a tax professional. The above discussion is for general information purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a holder's individual circumstances.

**HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES TO THE PLAN.**

## Conclusion

The Plan Proponents believe the Plan is in the best interests of all Creditors and holders of Interests and urge the holders entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots accepting the Plan.

Dated: ~~March 2~~April 5, 2011          **Garnet BioTherapeutics, Inc.**


                                         By: _____

                                         Its: _____


Dated: ~~March 2~~April 5, 2011          **SULLIVAN • HAZELTINE • ALLINSON LLC**


                                         _____
                                         William A. Hazeltine (No. 3294)
                                         901 North Market, Suite 1300
                                         Wilmington, DE 19801
                                         Tel: (302) 428-8191
                                         Fax: (302) 428-8195

                                         Attorneys for the Debtor and Debtor-in-Possession